663 So.2d 811 (1995)
Delores M. ROGERS, Clarence A. Rogers, Jr., Individually, as Surviving Spouse of Carrie A. Rogers, and as Natural Tutor on the Behalf of Damian M. Rogers, Jason E. Rogers, Jeremy M. Rogers and Danielle E. Rogers
v.
Earl ROCH, ABC Insurance Company, The State of Louisiana, and The Parish of Jefferson.
No. 95-CA-242.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 1995.
Writ Denied January 26, 1996.
*812 W.J. LeBlanc, Molaison & LeBlanc, Gretna, for Plaintiffs/Appellees, Delores M. Rogers, Clarence A. Rogers, Jr., Individually and as Surviving Spouse of Carrie A. Rogers, and as Natural Tutor on Behalf of Damian M. Rogers, Jason E. Rogers, Jeremy M. Rogers and Danielle E. Rogers.
Art J. Lentini, William Peter Connick, Connick, Lentini, Louledoux, Wimberly & deLaup, Metairie, for defendant/appellant, Parish of Jefferson.
Grayson H. Brown, Baton Rouge, for Defendant/Appellee, Traveler's Insurance Company.
Before BOWES, GRISBAUM and DUFRESNE, JJ.
BOWES, Judge.
Delores Rogers and Clarence A. Rogers Jr., individually and as natural tutor on behalf of his minor children, filed suit in the Twenty-Fourth Judicial District Court for the Parish of Jefferson for injuries received as the result of a head-on automobile collision on the Bayou Segnette Bridge. Killed in that accident were Carrie Rogers, wife of Clarence, and Jason Rogers, their 18 month old son. Other members of the family, Clarence and his other children, Damian, Jeremy, and Danielle Rogers, as well as Delores Rogers were severely injured.
The Rogers' suit was filed against Earl Roch, driver of the other vehicle; the State of Louisiana; the Parish of Jefferson; and ABC Insurance Company. Travelers Insurance Company, the excess insurer for the Parish of Jefferson, was later substituted for ABC Insurance Company by amended petition.
On motion of the plaintiff, the state was dismissed from the lawsuit prior to trial. By joint consent of the parties, the trial on the merits was bifurcated; the issue of liability was severed from damages and tried separately by the judge alone; the issue of damages remains open.
At the commencement of trial, plaintiff dismissed Roch without prejudice.
Following several days of trial, the court took the matter under advisement, ultimately rendering judgment in favor of plaintiffs and against all defendants, assessing 30% fault to the Parish of Jefferson and 70% fault to Roch.
All parties have appealed various aspects of the judgment.

FACTS
It is uncontested that on February 7, 1989, the Rogers vehicle, a van, was travelling east on the bridge; inside the van were Clarence and Carrie Rogers, along with their children, Damian, Jeremy, Danielle, and Jason, and the mother of Mr. Rogers, Delores Rogers. Roch was driving in the westbound lane; he *813 sneezed, then crossed the center line, and collided head on with the Rogers' vehicle in Rogers' lane of travel. Carrie Rogers was killed instantly; little Jason perished from his injuries several days later. Clarence suffered serious injury to his face and hips, and further suffered severe head injuries. As a result of their injuries, Danielle remained in a coma for some time and Jeremy was in a body cast.
Plaintiffs contended at trial, and on appeal, that the cause of the accident was the negligence of Roch, combined with the fault of the Parish of Jefferson in the design of the Bayou Segnette Bridge, and that the majority of the fault should be assessed to the parish. Specifically, plaintiffs aver that the bridge was designed to handle one-way traffic, but was being used for two-way traffic. In connection therewith, plaintiffs cite the lack of both a median barrier and full width shoulders as design flaws, and allege that the presence of these devices would have prevented the fatal accident. The parish urges that the bridge met the standards and guidelines existing at the time of its design and construction.

JUDGMENT OF THE TRIAL COURT
The trial court found as follows:
The defendants argue inter alia that the Parish was justified in not providing shoulders of normal width because the bridge was a "special case" under AASHO standards. The Court does not agree that the guidelines existing at the time of this accident justified maintenance of the bridge in its then existing condition. Once the Parish deviated from the originally planned use of the bridge as a one-way span, it should have taken measures, such as the erection of median barriers, which would have prevented the type of cross-over accident which occurred in this case. Its failure to take such measures was negligent and was a cause in fact of this accident.

ISSUES
On appeal, the parish and Traveler's allege that the trial court erred:
(1) in misconstruing the law applicable to design standards, and erroneously applied standards existing at the time of the accident rather than at the time of construction;
(2) in ruling that the existing shoulders were a contributing cause of the accident;
(3) in finding that the absence of a median barrier was a contributing cause of the accident;
(4) in assessing an excessive percentage of fault against the Parish; and
(5) in failing to assess comparative fault against the plaintiffs.
Plaintiffs urge that the trial court erred in its apportionment of fault because (1) it based its finding on evidence not contained in the record; and (2) failed to properly consider the factors set forth in Watson v. State Farm (infra).

EVIDENCE AND TESTIMONY
Allen Ketchens witnessed the accident and testified at trial. He was travelling behind the Rogers' van at about 45 miles per hour (and slowly gaining on the van) when he noticed the Roch automobile at the top of the bridge, about two feet over the yellow line. Because he used the bridge often and had seen other cars at the top swerve and pop right back, he "thought nothing of it." He turned to his right to look at something off to the side of the road, and when he looked back, the accident happened. He estimated the accident took place within about three to five seconds from the time he first saw the Roch automobile crossing into the wrong lane.
Roch testified that at the time of the accident he had not been drinking nor taking drugs.[1] He stated that he sneezed once, and *814 began to sneeze again when the accident happened. He did not recall crossing the center line, nor did he recall the accident itself. He did not know how long he was in the east lane prior to the impact.
Rogers testified that at the time of the accident, he was travelling in the center of his lane at about 40 m.p.h. (just prior to the accident he glanced down at his speedometer). When he looked up, about one-third of the way up the bridge, his wife cried out and, at the same time, he saw the Roch vehicle at the top of the bridge in his (Rogers) lane of traffic. The next thing he remembered was waking up after the accident.
On cross-examination, Rogers admitted that he had consumed two sips from a squeeze bottle containing Jack Daniels (bourbon) and water during Mardi Gras.[2] He stated that he was unable to estimate the distance between his van and the Roch vehicle when he first noticed defendant's car, although earlier, in a deposition he had given the figure of 30 to 40 feet, and then later, to an examining physician, he had given the estimate of 60 to 70 feet. He could not say whether he had time to react to the accident, since all he remembered after seeing the car was waking up. However, he agreed that in prior testimony (at Roch's criminal trial), he had stated that it had happened so fast there was nothing he could do.
The Louisiana Department of Highways Minimum Design Standards For Urban Streets and Highways was admitted into evidence. The exhibit reads, in part, as follows:
Min. Bridge Width (Face To Face Bridge Rail)Approach Pavement + Shoulders (9)(10).
(9) In special cases partial shoulders may be used
(10) 4' minimum must be provided from edge of travel lane to face of bridge rail.
Dr. Olin Dart was called on behalf of plaintiffs and accepted by the court as an expert in highway design, traffic engineering, traffic safety and accident reconstruction. He stated that the Bayou Segnette bridge was defective in its original design because it lacked full width shoulders and, combined with that, did not have a median to protect against cross-over accidents. He felt that with a long structure, shoulders should provide a place for storage of a vehicle that breaks downgetting the car out of the way so that it doesn't interfere with the flow of traffic or become a hazard; and/or as a place for avoiding another vehicle in a possible accident situation. He felt that the bridge did not meet state minimum design standards, inasmuch as those standards called for a minimum bridge width to be equal to the approach pavement, plus shoulders. The design, whether for one-way two-lane traffic or two-way two lane traffic, was thus defective for lack of shoulders.
He also said the state standards which discuss the permissive use of partial shoulders in "special cases" was not applicable in this case, that the bridge was not a special case, and in any circumstance, the clearance did not constitute even partial shoulders. The footnotes in the state design standards (above) could not be read together (as Dr. Blaschke testified, infra) because partial shoulders must be at least six feet. The lack of shoulders on the bridge, which also lacked a median, made it unreasonably dangerous because there was no way to avoid an accident. At the very least, the bridge should have had a median. A two foot wide "New Jersey" type median has been well accepted in this state and could have been used here.
On direct examination, Dr. Dart testified that when plaintiff first saw the Roch vehicle from the top of the bridge, the closest the two cars could have been was approximately five seconds apart. On cross examination, Dr. Dart allowed that the average time in which to perceive the vehicle, realize the danger, and begin evasive action was 1.6 seconds; and the probabilities were that when plaintiff saw defendant's vehicle, they were "maybe" two to three seconds apart. There was no data on the cross-over speed of the Roch vehicle, and there were several factors which remained unknown. However, based on the testimony of plaintiff that when *815 he first saw the front wheels of defendant's car they were fully in his lane; and the other probabilities, including the first possible time Mrs. Rogers could have seen the other car: "We're looking at something like maybe 2 seconds, about 1 and ½, 2 seconds perhaps beforefrom the time it first came over into viewit's just impossible to know."
Dr. Joseph Blaschke was called by plaintiffs and accepted by the court as an expert in traffic engineering and highway design. He visited the bridge and examined its construction plans and testified as follows:
That the bridge in question was designed according to, and met AASHO[3] guidelines available in 1977 (state design requirements are usually based on AASHO, although the state may adopt or adapt any design). Adherence to such was a good engineering practice. The width of the travel lanes was 28 feet; AASHO called for two 12 foot travel lanes as desirable, with 11 foot lanes as the minimum. Adoption of this guideline leaves two feet from the travel lane to the curb, the prescribed minimum in AASHO. The distance between the edge of the travel lane to the inside of the guardrail on the westbound side of the bridge was over three feet, and on the other side, it was over five feet (with AASHO requiring only three feet as a minimum). Partial shoulders could be used in "special cases" according to AASHO; however, a special case could be almost anything imaginable, with the engineer of the project as the interpreter. The extra width from the (11 or 12 foot) travel lanes could be called a partial clearance or partial shoulder. The purpose of this area on bridges is not to provide refuge for a vehicle, but to allow the motorist to perceive width.
In his opinion, the design of the bridge was not defective as a two-lane, two way bridge. A median barrier is to prevent crossover accidents, but they are not found on two-lane two way roads to any degree whatsoever because they cause problems. They are two feet wide, and would cause drivers to shy away from the barrier and in case of a stalled vehicle, traffic would bottleneck.
Dr. Blaschke testified that both footnotes 9 and 10, quoted infra, applied to this case; that the bridge was a "special" case, and that the footnotes could be read together and in fact "went together."
William Hickey, road design engineer for the State of Louisiana, testified on behalf of the parish via deposition that he was familiar with both the AASHO guidelines and the state minimum design standards for roads and highways. He testified that in the case of the Bayou Segnette bridge, no state or federal funds were used so as to require the Parish of Jefferson to utilize state standards, although state law does require that municipalities follow AASHO guidelines in these cases. He further said that the state was not involved in the design of the bridge in question.
Mr. Hickey testified that the bridge did meet the AASHO criteria or guidelines because of the following:
(1) the distance between the edge of the travel lane and the safety curb was two feet, the prescribed minimum in AASHO; and
(2) the distance between the edge of the travel lane to the inside of the guardrail on the westbound side of the bridge was three feet nine inches, and on the other side, it was over five feet (with AASHO requiring only three feet six inches).
He then stated that the state standards at the time of construction allowed partial shoulders to be used on long structures (which this bridge is) and that the purpose of a partial shoulder is to provide an offset from the base of the safety curbbecause drivers tend to shy away from the rail and, by offsetting the rail, a more open appearance is obtained on the bridge. Hickey further maintained that a two foot shoulder is not any refuge for a disabled vehicle and that there is no official definition of a "partial shoulder." Hickey stated: "... the interpretation of the two-foot offset being a partial shoulder, or not, I don't know about that."
*816 According to Mr. Hickey, the bridge also met state minimum design criteria of the time. Several hundred bridges were built during the decade of the 1970s which had shoulders similar to the Bayou Segnette bridge. The design was standard and there was no difference in the way the bridge should have been designed, whether it was for two lanes/one-way traffic, or two lanes/ two-way traffic. Reading from an AASHO manual, Mr. Hickey determined that a bridge of over 250 feet was considered a "long bridge" and, therefore, a "special case." The bridge in question here obviously qualifies for this category and also as a "long span" bridge being over 2,000 feet in length.
Also testifying by deposition on behalf of the parish was Henry W. Herbst, a civil engineer employed by de Laureal Engineers, the engineering firm which designed the Bayou Segnette Bridge, who testified as follows:
The original concept was to be twin spans of two lanes in each direction; one bridge was constructed, and was to be followed by the second bridge at some (undetermined) time. The design plans indicated that AASHO guide policy of 1965 was to be used on the project. In the AASHO design, a "long" bridge is not required to have full shoulders as is a "short" bridge, but the term "partial shoulders" is not defined. Additional width on a bridge is more of an offset, to allow the motorist to perceive width; a normal shoulder for disabled vehicles is not required.
When asked what specific factors came into play insofar as the design of the width of the bridge was concerned, Mr. Herbst answered that the standard width of bridges, curb to curb, at that time (1977) was 28 feet; a further factor was that both lanes went in a single direction. Mr. Herbst continued that when there are two lanes in one direction, there is always room for a breakdown lane there is no need, therefore, for shoulders on such a bridge. This, Mr. Herbst felt, was his recollection of the project and that these factors constituted the "special case." With a two-way "long" bridge "actually you would want to provide for some sort of shoulder," according to Herbst. If designed as a two-way bridge, the design would have been different, although the "different design" was not specified as either full shoulders or as requiring a median.
Robert Canfield, Director of Public Works for the City of Baton Rouge, was called on behalf of the parish and was qualified as an expert in the field of highway and bridge design. In his opinion, the Bayou Segnette Bridge did meet state design criteria. He agreed that partial shoulders may be used under these criteria; but although such are not defined, he felt that the clearances on Bayou Segnette are partial shoulders. Regarding the need for median barriers, he stated:
As I appreciate it, this particular bridge was intended to be one of a pair of bridges to be constructed, with the ultimate goal to go ahead and have them operate one-way. There, in my opinion was no apparent reason up-front, during the design stage, to call for the justification of putting a median barrier of this type on a bridge of this type.
[Emphasis supplied].
He further testified that there are roads in Baton Rouge which he has designed which do not meet minimum state standards.

NEGLIGENCE OF PARISH OF JEFFERSON
We cited the law applicable to the case before us in Devall v. Morgan, 424 So.2d 522 (La.App. 5 Cir.1982), as follows:
We are guided by the Supreme Court case of Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). The court recognized the Highway Department has a duty to maintain a reasonably safe highway for the protection of those people who could foreseeably be placed in danger by an unreasonably dangerous condition. That duty encompasses an obligation to provide and maintain an efficient and continuous system of all state highways and bridges. It must make safe any defect of the system of which it has or should have knowledge. Jones v. Louisiana Department of Highways, 338 So.2d 338 (La.App. 3d Cir.1976); Von Cannon v. State, Department of Highways, *817 306 So.2d 437 (La.App. 3d Cir.1975). The department is liable for damages when it is shown that the hazardous condition that caused the injuries was patently or obviously dangerous to the reasonably careful driver and the department, with actual or constructive knowledge, failed to correct the defect within a reasonable time. Shively v. Pickens, 346 So.2d 1314 (La.App. 3d Cir.1977); Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3d Cir.1974).
However, the failure of the state to update its highways to the current standards does not establish the existence of a hazardous defect. Usry v. Louisiana Department of Highways, 402 So.2d 240 (La. App. 4th Cir.1981); Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3d Cir.1974). To impose a burden upon the state of having to update its thousands of miles of highways within the latest guidelines would be an impossible one to fulfill. Roberts v. Winston Carriers, Inc. Ibid.

It is well settled that the highway department is not an insurer of the safety of all motorists on the roads, but has the obligation to maintain the roads and highways in a reasonably safe condition for a reasonable prudent driver. State Farm Mutual Automobile Insurance Co. v. Slaydon, 376 So.2d 97 (La.1979); Hodges v. State, Through Dept. of Highways, 370 So.2d 1274 (La.App. 3d Cir.1979); Wilson v. State, Through Dept. of Highways, 364 So.2d 1313 (La.App. 3d Cir.1978).
The action of drivers in crossing the center line has previously been discussed. When a driver is involved in an accident in the opposite lane he is presumed negligent and is required to exculpate himself from fault. Simon v. Ford Motor Company, supra [282 So.2d 126 (La.1973)]; Rizley v. Cutrer, 232 La. 655, 95 So.2d 139 (1957).
[Emphasis supplied].
After much consideration, we find that plaintiffs' case before us must fail for several reasons. Of the five experts who testified on the bridge design, only Dr. Dart, plaintiff's expert, found the design to be defective. The remaining experts, all of whom appear to be well qualified and were accepted by the court as such, stated that the bridge met both AASHO design standards, as well as those of the state. The opinion of Dr. Dart, that the bridge was defective because of the lack of full shoulders, was unsupported by any authorities or evidence adduced at trial. There was nothing in the AASHO guidelines, nor in the state minimum design standards introduced at trial, which supported his opinion. There was nothing in the record which supported his conclusion that a "partial shoulder" must be at least six feet, nor a factual basis for his opinion that the two footnotes in the state design standards could not be applied simultaneously.
Similarly, it was agreed amongst all experts, except Dr. Dart, that a median barrier was not required in the original design of this bridge and logical reasons were given why such barrier would not be necessary or desirable. There is no evidence of record establishing a history of these types of accidents so as to have necessitated the addition of a barrier after the bridge was constructed. Documents submitted by the parish show that from 1981 through 1989, there was only one head-on collision in 1985 and two in 1989, including the present accident. Since there is no history of many, or even several, collisions on the bridge, we cannot conclude from these documents that a hazardous condition existed which was patently or obviously dangerous to the reasonably careful driver. Therefore, we find that the department was not on notice of any "defect" or "danger," and failed to correct it.
Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229; Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La.App. 2 Cir.1991). For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La.App. 4 Cir.1993); Russ v. Jones, 580 So.2d 1098 (La.App. 4 Cir.1991). If the opinion is based upon facts not supported by the *818 record, the opinion may be rejected. Meany, supra.
With all due respect to the qualifications and experience of Dr. Dart, the facts upon which his opinion is based relative to an improper or inadequate design, the requirement of full shoulders on the bridge, and the necessity of a median barrier, are absent from the record; in contrast, the opinions of all of the other expert witnesses are amply supported by the above mentioned and documented standards of AASHO and the state. According to the other experts, the Bayou Segnette Bridge had clearances which met and exceeded the minimum design standards at the time the bridge was designed and built.
In Theriot v. Lasseigne, 93-2661 (La. 7/5/94), 640 So.2d 1305, our Supreme Court stated as follows:
Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler [v. Liberty Mutual Ins. Co.], 558 So.2d [1106] at 1111 [La. 1990]. In Stobart [v. State, Dept. of Trans., 617 So.2d 880 (La.1993)], we said:
However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... Nonetheless this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.'" (citations omitted).
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990); Falkowski v. Maurus, 637 So.2d 522 (La.App. 1 Cir.1993). After careful consideration of the applicable standards of review and the testimony of all the experts, we are obliged to conclude that the trial judge's reliance on the unsupported opinion of Dr. Dart and his determination that the bridge was defective and did not conform to minimum design standards of the time was not a permissible or reasonable choice. We are forced to this conclusion in view of the overwhelming evidence to the contrary contained in the opinions of four other equally qualified experts that the bridge was not defective and did comply with good design standards of the time. These opinions are supported by adequate and valid authorities, both of the state and of AASHO; while the opinion of Dr. Dart was almost completely unsupported by evidence other than his own beliefs.
We find, therefore, that the trial court was clearly wrong or manifestly erroneous in finding there was a design defect and that the Parish of Jefferson was partially liable for the accident. There was no showing that the lack of a barrier or small shoulder presented an unreasonable risk of injury to the reasonably prudent motorist. There was also no showing that any "corrective" measures short of building an entirely new span would have helped.
Further, it is evident that even if the bridge were defectively designed, such defect must be a cause in fact of the accident in order to hold the parish liable. Under either the theory of negligence or strict liability, the duty owed is the same.
Plaintiffs brought this suit against DOTD under theories of both negligence and strict liability. Under either theory, the duty owed is the same and a finding of cause-in-fact is essential to the assessment of liability. Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La. 1/14/94), 630 So.2d 1289 (La.1994). Cause-in-fact is usually a `but for' inquiry which tests whether or not the injury would have occurred `but for' the defendant's substandard conduct. Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289 (La.1993). A finding of no cause-in-fact ends the inquiry into liability. *819 Theriot v. Lasseigne, 93-2661 (La. 7/5/94), 640 So.2d 1305.
According to the testimony here, it is apparent that Mr. Rogers is unable to state, with any certainty, how far he was from the Roch vehicle when he noticed it, inasmuch as his very serious injuries have left him with a loss of memory at that point. Additionally, he is unable to state whether he attempted any evasive action, and the physical evidence is inconclusive on that point. However, it appears, taking all the evidence and testimony on this point as a whole, that plaintiff failed to carry his burden of proving that, had the bridge possessed full width shoulders, that plaintiff would have been able, that he would have had time, to avoid the accident. In other words, plaintiff failed to prove that the lack of full width shoulders or other design of the bridge was a cause-in-fact of the accident.
With regard to the lack of median barrier being a cause of the accident, this Court has previously held that such cross-over accidents would not have occurred but for the negligence of the tortfeasor driver. See Utley v. State, 570 So.2d 501 (La.App. 5 Cir. 1990); Seymour v. LaCava, 522 So.2d 683 (La.App. 5 Cir.1988). See also Carter v. Deitz, 556 So.2d 842 (La.App. 4 Cir.1990). Therefore, the lack of a median barrier was not a cause in fact of the accidenthere rather, it was caused entirely by the negligence of Mr. Roch.
In summary, the plaintiff failed to prove that the Bayou Segnette Bridge was defectively or improperly designed or maintained. In addition, it was not proven at trial that either possible defect, if there had been one, was a cause in fact of the accident in question.

DECREE
For the foregoing reasons, the judgment in favor of plaintiffs and against the defendants, Parish of Jefferson and their insurer Traveler's, is reversed, and the case is dismissed.
REVERSED.
NOTES
[1] There is no evidence indicating that Roch was intoxicated or had been drinking heavily at the time of the accident and the trial judge's statement to the contrary is erroneous. However, Roch admitted that approximately a month before the accident he had gone through a detoxification program to be weaned from prescription medication. He has been convicted of vehicular homicide and, at the time of the civil trial, was serving his sentence at the Louisiana State Penitentiary at Angola.
[2] There was no implication that Rogers was intoxicated at the time of the accident.
[3] American Association, State Highway and Transportation Engineers, alternately referred to as AASHO. These are guidelines, not regulations.