763 So.2d 60 (2000)
Lloyd G. BARRE, et al.
v.
Latanja C. BONDS, et al.
No. 99-CA-1806.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 2000.
*62 James Maher, III, New Orleans, LA, and Herbert A. Cade, Cade & Collins, New Orleans, LA, Attorney for Plaintiffs/Appellants.
Pamela W. Carter, LeBlanc, Miranda & deLaup, Metairie, LA, Attorney for Defendant/Appellee.
(Court composed of Chief Judge ROBERT J. KLEES, Judge CHARLES R. JONES and Judge MICHAEL E. KIRBY).
JONES, Judge.
Plaintiffs/appellants, Conrad Barre and Wayne Legaux, appeal the judgment of the trial court denying their Motion for Judgment Notwithstanding the Verdict and their Motion for New Trial. Following a three-day jury trial, the trial court entered a directed verdict in favor of the plaintiffs on the issue of liability. However, the jury unanimously concluded that the accident in question did not cause the plaintiffs' injuries. After reviewing the record, we affirm the judgment of the trial court.

FACTS
On July 20, 1996, the defendant, Latanja Bonds, was operating a Nissan Altima and headed east on Curran Road when she struck a black Chevy Blazer in the left driver's side door while crossing the intersection of Curran Road and Lucerne Street. Derrick Brown owned the vehicle Ms. Bonds was driving. Lloyd Barre was driving the Chevy Blazer and he had four *63 other passengers in this vehicle, namely Phil Barre, Conrad Barre (C. Barre), Patrick Barre and Wayne Legaux.
All of the occupants in the Barre vehicle filed suit against Ms. Bonds, the tortfeasor; Progressive Security Insurance Company (Progressive), the liability insurer for the Nissan Altima owned by Derrick Brown; Prudential Property and Casualty Insurance Company of America (Prudential), Barre's liability insurer; and Classic Syndicate, Inc., Legaux's liability insurer.[1]
Lloyd Barre, Phil Barre and Patrick Barre resolved their claims as against all defendants. However, C. Barre and Wayne Legaux resolved their claims as to all defendants except as to Prudential. Following a three-day trial, the jury determined that notwithstanding Ms. Bonds' negligent actions, the injuries allegedly sustained by C. Barre and Legaux were not caused from Ms. Bonds' collision with Lloyd Barre's vehicle. Once the verdict was rendered, C. Barre and Legaux filed a Motion for JNOV, which was subsequently denied. It is from this judgment that they each filed the instant appeal.
More specifically, C. Barre and Legaux allege three distinct assignments of error. First, they argue that the evidence presented at trial was sufficient to show that their injuries were caused by the accident in July 1996. Secondly, they argue that trial court erred in allowing Prudential to cross examine their expert witness with medical records that were not intended to be admitted into evidence; moreover, they argue that notwithstanding Prudential's improper use of the records, the records used were not even certified. Thirdly, they argue that they were entitled to a new trial because of possible juror misconduct.

SUFFICIENCY OF EVIDENCE
In their first assignment of error, C. Barre and Legaux argue that the jury erred in rendering a verdict in favor of Prudential given the evidence and testimony introduced at trial. Both argue that their location in Lloyd Barre's vehicle caused them to receive the bulk of the impact from the accident. They argue that their injuries caused them to sustain serious pain and discomfort immediately following the accident, and most importantly, they sustained permanent injuries to their backs. Therefore, they argue that the jury's verdict should be reversed and this Court should remand this matter to the district court for a new trial.
In response, Prudential argues that notwithstanding the directed verdict in favor of C. Barre and Legaux on liability, the accident that took place on July 20, 1996 was not the proximate cause of their injuries. In fact, Prudential argues, that the their medical records and the expert testimony from Drs. Gary Carroll, James Butler, and Harry Hoerner revealed that the injuries sustained by these two plaintiffs resulted either from previous automobile accidents, prior medical conditions or from the gradual deterioration of their bodies due to their ages. Further, Prudential argues that C. Barre and Legaux were not truthful in their medical histories; therefore, the diagnoses from Drs. Hoerner and Carroll were inaccurate. Hence, the jury was correct in finding that the injuries sustained by C. Barre and Legaux's were not the result of the July 20th accident. We agree.

a. Standard of Review
It is well settled jurisprudence that a reviewing court has a constitutional duty to review facts, not to decide if we, as a reviewing court, would have found the facts differently, but to simply determine whether the jury's verdict was manifestly erroneous or clearly wrong based on the evidence, or clearly without evidentiary support. Harris v. Regional Transit Authority, 95-0282 (La.App. 4 Cir. 9/28/95), 662 So.2d 134, 137.
*64 The reason for this principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Id.; see also Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). Even though the appellate courts may feel that its own evaluations and inferences are more reasonable than the factfinder's conclusions, the reviewing court may not disturb those findingsespecially where there is a conflict in the testimony offered at trial. Coscino v. Louisiana State Boxing and Wrestling Com'n, 97-2733 (La.App. 4 Cir. 9/9/98), 718 So.2d 1016.
Additionally, the factfinder's assessment of credibility extends to competing expert witnesses since the factfinder is in the best position to observe the respective demeanor of every witness. Koepp v. Sea-Land Service, Inc., 93-2562 (La.App. 4 Cir. 11/17/94), 645 So.2d 1269, 1273. As the finder of fact, the jury has the discretion to accept or reject the testimony of any witness. Arceneaux v. Wallis, 94-2016 (La.App. 4 Cir. 4/26/95), 654 So.2d 1117.

Conrad Barre
C. Barre, who was 47 years old on the date of trial, testified that he and the other passengers in Lloyd Barre's vehicle were on their way to the South Shore Harbor when they were involved in this automobile accident. According to his testimony, Ms. Bonds ran a stop sign at the intersection of Lucerne Street and Curran Road and struck their vehicle in the left driver's side door. C. Barre testified that he did not see Ms. Bonds' vehicle approaching the intersection because he was seated in the rear middle seat of the vehicle when the impact occurred. He also testified that during the collision he struck both Patrick Barre and Legaux who were seated to his right and to his left respectively. C. Barre further described the impact as "awful," since he believed that the force from the impact was going to flip the Chevy Blazer on its side. Further, he testified that the pager he was wearing before the impact had been destroyed. Additionally, C. Barre testified that Ms. Bonds' vehicle appeared to be totaled considering that the front end was completely smashed, the air bags were deployed and her vehicle had to be towed away.
Following the collision, C. Barre testified he had soreness in his lower back and neck, but he declined emergency medical care because "he didn't think it was necessary." When he continued having pain in his lower back and neck, he went to see an attorney, who referred him to Dr. Carroll, for treatment.
According to C. Barre, Dr. Carroll administered heat therapy to him, which did improve his neck pain, but the pain in his lower back persisted. Therefore, in January 1996, he returned to his attorney for a referral to a specialist, and his attorney referred him to Dr. Harry Hoerner, an orthopedic surgeon, for further treatment. In February 1996, Dr. Hoerner conducted a MRI on C. Barre's back and discovered that he had a torn or damaged disc. Dr. Hoerner then prescribed Thera-Gesic cream for his back, along with oral medication, and he recommended that C. Barre perform certain exercises to strengthen his back. In conjunction with the medications, Dr. Hoerner advised C. Barre not to do any stooping, bending, crawling squatting, kneeling or standing for prolonged periods of time since this type of activity could cause the disc in his back to rupture.
Shortly thereafter, C. Barre stopped using the oral medication because he testified that it was causing him to become nauseous, and he could not take the medication when his job as a supervisor over a janitorial service required him to drive. He also testified that Dr. Hoerner prohibited him from doing his regular gardening activities, household chores or any strenuous activity because of the possibility that *65 his condition could become worse. He further testified that he was reluctant about doing physical labor work because of the possibility that he may become crippled.
On cross-examination, C. Barre conceded that he did not miss any time from work because of his injuries in the July accident. He also admitted that he did not consult with his own primary care physician before seeking a referral to an orthopedist from his attorney. Moreover, he testified that though he felt he could become disabled if he did any sort of strenuous work, he continued to report to work following the accident.
C. Barre also conceded that he injured his neck and shoulder in an automobile accident in March 1996, and denied having any problems or complaints with his back. He also testified that this information was not disclosed to any of the physicians who were treating him for the July accident because he fully recovered from the pain in his neck and shoulder following three months of treatment with an internist.

Wayne Legaux
Legaux, who was 50 years old on the date of trial, testified that he was positioned in the left rear seat directly behind Lloyd Barre when the collision occurred. He testified that Lloyd Barre attempted to warn everyone that another car was about to hit them, but while Lloyd was speaking he heard a loud noise and felt the car rising. When the police arrived, Legaux testified he was feeling pain in the left side of his body from his ankle to his lower back; however, he declined emergency medical treatment because he did not believe that the pain was severe.
Yet, when the pain persisted, he, like C. Barre, received a referral to Dr. Carroll from their trial attorney. Legaux informed Dr. Carroll that he had not had any problems with his back or the left side of his body before the accident in questioned. In October 1996, and shortly after his first visit with Dr. Carroll, Legaux underwent surgery to remove his prostate because it proved positive for cancer.
Once he received his post-operative treatment, Legaux returned to Dr. Carroll for follow-up treatment for the injuries to his back and the left portion of his body. When Legaux stated that he was still having pain in those areas, Dr. Carroll conducted a physical examination, which did not reveal any abnormalities. However, he testified, Dr. Carroll recommended that he take warm showers to increase the circulation to the injured areas, and he prescribed Ansayd, Lodine, and moist heat packs to treat the pain and inflammation. Because these medications caused him to be nauseous, Legaux began taking over-the-counter medication for the pain.
When Dr. Carroll's treatment did not ameliorate his symptoms, Legaux requested that his attorney refer him to a specialist. After receiving a list of orthopedists in his area from his attorney, Legaux selected Dr. Hoerner, who treated him for six months. Legaux testified that Dr. Hoerner obtained a medical history from him and then conducted a MRI on his back whereupon he discovered that Legaux had two herniated discs. Dr. Hoerner then discussed several options with him for relieving the pain and inflammation from the herniated discs, including surgery and cortisone injections in his back. However, Legaux testified he was very reluctant to have the surgery or the injections; however, rather he elected to implement several alternative methods of reducing the pain in his back. The alternatives were lots of walking, a low-fat diet, use of over-the counter medication, and sitting in warm water in his whirlpool at home.
As it relates to his medical history, Legaux testified that he saw Dr. Dwight McKenna twelve years ago because of an automobile accident in 1986; however, he denied having any back problems or complaints from that accident. He testified that Dr. McKenna took x-rays of his back, but he did not receive any extensive medical treatment. In 1992, Legaux went to *66 another physician because of prostate problems, and during the examination he disclosed to the doctor that he had "occasional" back pain. Again, no medical treatment was given in relation to the alleged back pain and the physician did not give him any indication of the source of his back pain.
In 1996, Legaux went to see Dr. Robert Jeanfreau, his family physician, who was employed at the IMG Healthcare Network and United Medical Center. Legaux testified that he went to see Dr. Jeanfreau because he was having heart problems because his family has had a strong history of heart disease. During the examination, he told Dr. Jeanfreau that he was having occasional back pain. Dr. Jeanfreau did not treat or x-ray his back, and there was no explanation given to him regarding the source of his back pain. Additionally, no MRIs were conducted and no medication was prescribed to him for his back complaints.
Following his treatment with Dr. Hoerner, Legaux testified he met with Dr. James Butler, the defense's Independent Medical Examiner, for a physical examination. Following Dr. Butler's brief examination, Legaux testified, Dr. Butler informed him that he discovered that Legaux had two herniated discs, and that he could enroll him into physical therapy to treat his leg problems without resorting to surgery. Legaux testified that he was impressed with Dr. Butler's examination and wanted to do some follow-up treatment with him regarding his leg.
Finally, Legaux testified, the pain he experiences in his back and leg usually occurs in the morning hours and is similar to a "toothache" or a "pulled muscle." He testified that he has difficulty driving, and that the profits from his used car dealership have been declining since the accident because he has been unable to perform the necessary mechanic work on the cars he and his son purchased from local auctions to sell.
On cross-examination, Legaux conceded that he chose to select his treating physician for the July 20th accident from a list of the physicians his attorney referred to him rather than seeking medical attention from his primary care physician. He also testified that he did not inform Drs. Carroll, Hoerner or Butler of any prior back pain he was having before they conducted their examinations. Moreover, Legaux admitted that he did not complete his treatment with Dr. Carroll before seeking a referral to an orthopedist from his attorney. The record also indicates that Legaux's medical records from Dr. Jeanfreau's office revealed that Legaux was complaining of chronic low back pain in April 1996.[2]
Additionally, Legaux testified, his last visit with Dr. Hoerner was in June 1997, and he had not gone to any other doctor since then except for Dr. Butler. He also admitted that the over-the-counter medication did help relieve some of the pain in his back thereby making the pain more tolerable and reducing the need for surgery.

Dr. Gary Carroll
Dr. Carroll, a board certified physician in the fields of infectious diseases and emergency medicine since 1974, testified as the expert witness for C. Barre and Legaux. Dr. Carroll testified that his practice is primarily composed of evaluating patients for Social Security, disability, and worker's compensation benefits. He testified that the Social Security Administration refers approximately 95% of his patients and the remaining 5% of his patients are referrals from attorneysboth plaintiff and defense.

a. Conrad Barre
Dr. Carroll testified that C. Barre met with him on July 25, 1996, for pain he was *67 having in his neck and back following a motor vehicle accident on July 20, 1996. Dr. Carroll gave a brief description of C. Barre's recollection of the events leading up to the accident and then he gave a brief description of C. Barre's medical history. He also noted that following the accident in question, C. Barre complained of neck and back problems.
Dr. Carroll's examination revealed that C. Barre had tenderness in both his cervical and trapezius muscle; therefore, Dr. Carroll testified, he diagnosed C. Barre with muscular ligamentous. Dr. Carroll indicated that C. Barre's cervical disc was narrowed but the narrowing of the disc was congenital and not related to the recent accident. As it relates to the back, Dr. Carroll noted minor degenerative changes in C. Barre's his back, a normal occurrence for someone in C. Barre's age group.[3] Upon making this diagnosis, Dr. Carroll recommended that C. Barre take warm soaks and showers.
Dr. Carroll testified that he scheduled five more office visits with C. Barre. Following each visit, he noted that the pain and spasms in C. Barre's neck and back were minimal with minor stiffness in the morning hours. On his last visit, Dr. Carroll testified, C. Barre's neck was asymptomatic, but the pain and spasm in his back continued; nevertheless, Dr. Carroll recommended that C. Barre continued with the previously recommended treatment. A short time later, C. Barre contacted Dr. Carroll's office and requested that the doctor discharge him so that he could do the follow-up treatment for his back with Dr. Hoerner.
When Dr. Carroll was presented with a copy of the radiology report from Dr. Lamar Teaford, he testified that the report revealed early degenerative disc disease in C. Barre's back at the L4, L5 region. The report also indicated that the L5, S1 region which is just below the L4, L5 region, showed evidence of an annulus fibrosis radial tear with some protrusion of disc material. Dr. Carroll testified that even though the report does not indicate any evidence of herniation or degeneration at the L5, S1 level, the tear is a permanent condition, which will probably become worse over time.
On cross-examination, Dr. Carroll admitted that C. Barre had degenerative disc disease in both his neck and back when he initially met him in July 1996 and that C. Barre's neck had improved substantially after only five months of treatment. Dr. Carroll further conceded that the pain C. Barre was experiencing in his back following his January 1997 visit could have also been caused by degenerative disc disease rather than from some form of trauma. The doctor also admitted that he was not aware that C. Barre was involved in any previous automobile accidents or that he had has prior injuries from those accidents.[4]
In essence, Dr. Carroll's testimony revealed a physician's diagnosis is intimately related to the information given by the patient in his medical history. In this case, the doctor testified, it is difficult for any physician to state with a certainty that C. Barre's back pain was the result of the July 20th accident or degenerative disc *68 disease in light of the resulting condition of his lumbar spine.

b. Wayne Legaux
Legaux's first visit with Dr. Carroll also occurred on July 25, 1996, whereupon Dr. Carroll obtained his medical history and questioned him about present complaints. After obtaining this information, Dr. Carroll ordered x-rays of Legaux back and left leg. He then ordered x-rays of Legaux's lumbar spine and left leg. From the xrays, Dr. Carroll testified, he discovered that Legaux had a full range of motion in his left ankle and knee, but there was some pain and spasm in those areas as well. He also discovered a slight lumbar scoliosis with convexity to the left as well as failure of closure of the neural arch of S1. The doctor explained that most people with slight scoliosis are asymptomatic (have no visible symptoms). Therefore, he concluded that the pain Legaux was experiencing was not the result of the slight scoliosis in his lumbar spine. He initially diagnosed Legaux with muscular ligamentous injury to the back and contusions to the left knee and left ankle. Using the MRI report taken on December 10, 1996, at the New Orleans Radiology Group, Dr. Carroll testified, Legaux has two herniated discs caused by degenerative disc disease at the L4, L5 level. He also testified that Legaux has a tear at the L5, S1 level, which was also pressing on a nerve root. However, the doctor further testified, Legaux did not show any signs of neurological or sensory loss.
Nevertheless, Dr. Carroll recommended warm showers, which is commonly used to treat soft tissue injuries by increasing circulation to the injured areas of the body. He also prescribed Ansayd, a non-steroidal, anti-inflammatory drug, which is used to relieve pain and inflammation. The doctor further testified that the treatments he recommended were designed to treat the symptoms and not to cure the injuries.[5]
Following Legaux's third visit, Dr. Carroll testified, the pain in Legaux's left leg had fully dissipated, but he was still experiencing pain and spasm (involuntary muscle contraction) in his back. Therefore, he recommended that Legaux continue with the medication and the physical therapy until further notice. Though he was scheduled for a fourth appointment, Dr. Carroll testified, Legaux did not appear for his appointment; however, the doctor later learned that Legaux was doing his follow-up treatment with Dr. Hoerner.
Once again, cross-examination revealed that the medical history information given to Dr. Carroll was either inaccurate or incomplete. Legaux did not disclose that he had previous trauma or was previously treated for injuries sustained from another vehicular accident prior to the accident in question. Further, Dr. Carroll's testimony reflects that it is possible that degenerative disc disease was causing the pain and spasm Legaux was experiencing in his back.

Dr. Harry Hoerner
Dr. Hoerner, a board certified orthopedic surgeon since 1973, testified that he maintains a general practice in orthopedics with patients who are referred to him by the Worker's Compensation office and by attorneysboth plaintiff and defense. He also testified that since becoming a board certified orthopedist, he has acted as an Independent Medical Examiner on several occasions.

a. Conrad Barre

Dr. Hoerner testified that he first saw C. Barre in February 1997. The patient related to him that he was experiencing low back pain and soreness in his neck. After receiving the same medical history that was given to Dr. Carroll, Dr. Hoerner *69 conducted a physical examination and discovered that C. Barre had slight tenderness to deep palpitation in his neck, but there was no evidence of spasm to the cervical spine. However, there was pain and tenderness in the lumbar spine with a decreased range of motion, but there was no evidence of spasm. Following the evaluation, Dr. Hoerner diagnosed C. Barre with cervical musculoligamentous strain and with chronic lumbosacral strain with early degenerative disc disease.
Within two months of treatment, Dr. Hoerner testified that the pain in C. Barre's neck had completely subsided. As it relates to his back, Dr. Hoener's examination revealed a slight narrowing at the L5, S1 level. Subsequently, Dr. Hoerner ordered a MRI of C. Barre's lumbar spine. The MRI reported that there was degenerative changes at the L4, L5 level, a tear in the annulus fibrosis at level L5, S1 level, and a three millimeter disc bulge which was compressing on the left L5 nerve root. Dr. Hoerner testified that disc bulge was close to being a herniation of the L5, S1 level, but there were no degenerative changes in this region of the lumbar spine.[6]
Dr. Hoerner opined that the condition at the L5, S1 level was permanent and was more probably than not caused by the accident on July 20, 1996. As a result of his findings, Dr. Hoerner prescribed a course of treatment consisting of a prescription for muscle relaxants, an anti-inflammatory and a deep-heat medication, and a regiment of exercises for his neck and back. In June 1997, following four months of treatment, Dr. Hoerner decided that C. Barre should be discharged because he believed that the patient had achieved maximum medical improvement in his neck and back; therefore, Dr. Hoerner told the patient to return if he had any other problems. Considering the condition of his back, the doctor assessed C. Barre with a 5% whole body anatomical disability.
On cross-examination, Dr. Hoerner conceded that on each visit with C. Barre there was no indication of any abnormalities in the patient's neurological examination. He also admitted that the pain C. Barre was experiencing could have been from degenerative disc disease, and there was evidence that the disease was in his body prior to the July accident. Further, Dr. Hoerner conceded that the patient's activities in between his last visit with Dr. Carroll and his first visit with him could have been a factor in causing the pain in his back. However, Dr. Hoerner also admitted that he did not perform a full inquiry into C. Barre's activities when obtaining the patient's medical history, and subsequently rendering his diagnosis.

b. Wayne Legaux
Dr. Hoerner testified that he met with Legaux on February 5, 1997, whereby the patient related to him that he was involved in an automobile accident in July 1996. He diagnosed Legaux with scoliosis in the lumbo sacral spine and a slightly narrowed disc at the L5, S1 level. The patient also had a slightly positive straight leg test, which showed a strained sciatic nerve, which Dr. Hoerner believed was cased by a herniated disc. Based upon his preliminary findings, Dr. Hoerner prescribed Lodine, Thera-Gesic cream, a muscle relaxant and he recommended that Legaux submit to a MRI.
Per Dr. Hoerner's request, Legaux submitted to an MRI that was performed by Dr. Teaford of Crescent City MRI. The MRI revealed two herniated discs (L4, L5 level and L5, S1 level). Dr. Hoerner testified that the herniation at the L4, L5 level impinged on a nerve root on the left side of the patient's body and that it was the result of degenerative disc disease. Despite the fact that degenerative disc disease *70 was present in Legaux's body prior to the accident, Dr. Hoerner opined that the herniations at the L4, L5 level and the L5, S1 level were more than likely caused by the trauma or accident on July 20th.
Dr. Hoerner discussed with the patient the option of having surgery as a method for relieving the pain in his back caused by the herniated discs. Nevertheless, Legaux declined to have the surgery, and Dr. Hoerner allowed him to continue using over-the-counter pain medication since his condition was permanent. As a result of his injuries, Dr. Hoerner gave Legaux a 10% to 15% whole body disability rating and restricted him from prolonged periods of standing, walking, squatting, bending, crawling, kneeling or lifting of anything over 15 pounds.
On cross-examination, Dr. Hoerner conceded that two of the options for relieving the type of back pain Legaux was having were not discussed, which were cortisone injections and physical therapy. Also, the record reflects that even though Legaux's two herniated discs may have been permanent, the patient did show signs of improvement, which was evidenced by his negative straight leg test following four months of treatment. Further, Dr. Hoerner admitted that he was not aware that Legaux was involved in two other motor vehicle accidents prior to the accident in question.

Dr. James Butler[7]
Dr. Butler, a board-certified orthopedist and associate professor at Tulane Medical Center, testified that he also evaluated Legaux regarding the injuries he allegedly sustained on July 20, 1996. He agreed with Drs. Carroll and Hoerner diagnosis that the patient was suffering from two herniated discs. However, he concluded that the symptoms as well as the herniated discs were the result of degenerative disc disease. He also testified that a herniation could result from degenerative disc disease without any intervening trauma. He assessed Legaux with a 10% whole body physical impairment, and noted that a cortisone injection or an epidural steroid injection usually relieves about 60% of the pain most individuals have from low back injuries.
On cross-examination, Dr. Butler testified that he only reviewed the records from Dr. Hoerner's office since he was unaware of any other medical records Legaux had from prior automobile accidents. Nevertheless, he testified that the chronic low back pain alluded to the patient's prior medical records would have been vital information for him as well as any other physician who was asked to determine the source of the patient's low back pain. Also, he testified that since this information was not disclosed to the other doctors it may have altered their diagnoses considering that neither of them offered any follow-up treatment to Legaux. Further, Dr. Butler testified, Legaux's previous medical records only disclose low back pain, not pain from herniated discs, which would have caused a physician to inquire further and recommend some form of treatment. Dr. Butler also proposed that prostate disease could have also been a factor in Legaux's low back pain. Additionally, Dr. Butler admitted, it would have been proper to suggest cortisone injections or physical therapy to the patient before discussing with him the possibility of having back surgery.

Analysis of the Evidence
The assessment of credibility of competing expert witnesses is best left to the trier of fact, who has the opportunity to observe the respective demeanor of the witnesses. See Koepp, supra. Where there is evidence before the trier of fact, which, upon its reasonable evaluation as to credibility, furnishes a reasonable basis for the [factfinder's] finding, it should not be disturbed in the absence of manifest error. Id.; see also Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612, 615.
*71 In the case sub judice, we find that it was reasonable for the jury to conclude that the conflict in the expert witnesses' diagnoses of the plaintiffs' injuries was due in part because the plaintiffs were not truthful in their medical histories. The record also indicates that degenerative disc disease can exist within the body of a middle-aged person even though that person may not currently be suffering from any pain or discomfort. Therefore, when trauma does occurs, it may not be possible for a physician to accurately pinpoint the source of the pain since the person's body had already started to deteriorate. Additionally, the record reflects that both Drs. Hoerner and Carroll testified that degenerative disc disease was present in the both of the plaintiffs' bodies prior to the accident in question.
Moreover, it appears that the jury was not convinced that neither C. Barre nor Legaux injuries were as severe as they testified to in trial. The jury may have concluded that had their injuries been as serious as they alluded to, then they would have taken more aggressive measures to alleviate the pain in their backs rather than just resorting to warm showers, muscle relaxants and exercises. Furthermore, their request for a referral to a specialist from their attorney may have also contributed to the jury's disbelief. See Lightell v. Couvillion, 99-1597 (La.App. 4th Cir. 2/16/00), 757 So.2d 39. Accordingly, we find that it was not an abuse of discretion for the jury to conclude that C. Barre and Legaux failed to establish that their injuries were caused from the automobile accident on July 20, 1996.

MEDICAL RECORDS
In their second assignment of error, C. Barre and Legaux argue that the trial court erred in allowing Prudential to impeach their testimony and to cross-examine their expert witness, namely Dr. Carroll, with the medical records from other physicians who were not called as witnesses during trial. C. Barre and Legaux admitted that they were examined by the other doctors, and received a Notice of Records Depositions and copies of the medical records from their previous treating physicians. However, because Prudential did not intend to introduce the records into evidence, they argue that it was error for the trial court to allow Prudential to cross-examine Dr. Carroll with these medical records and then use him to read the contents of the medical records into the trial record.
Further, Legaux argues that the trial court committed manifest error when it overruled his objection to Prudential's attempt to cross-examine Dr. Carroll with his prior medical recordsespecially since the medical records used at trial by Prudential had not been certified by his treating physician. Rather than instruct Prudential not to use the uncertified medical records, the trial court instructed Prudential to subpoena another certified copy of these records from the treating physician so that the court could determine whether the records were in fact for Wayne Legaux. Thus, C. Barre and Legaux argue that the trial court abandoned its status as a "neutral arbiter," when it instructed Prudential to subpoena the records.
In rebuttal, Prudential argues that it was not error for it to cross-examine Dr. Carroll about the previous medical records and the information included therein because Dr. Carroll testified that an accurate medical history was an integral part of a physician's diagnosis. Therefore, Prudential argues, the records were used solely to indicate that both C. Barre and Legaux were not truthful with Dr. Carroll when they made their initial visit to his office on July 25, 1996. Moreover, Prudential argues, La. C.E. art 703 allows an expert to be questioned and cross-examined with evidence, data or facts which are reasonably relied upon by experts in a similar field of study even though said information is not intended to be admitted into evidence. We agree.
*72 As a general rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the expert's opinion in cross-examination. LSA-C.E. art. 702; see also Rowe v. State Farm Mut. Auto. Ins. Co., 95-669 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, 728, wit denied 96-0824 (La.5/17/96), 673 So.2d 611. (Emphasis added). Yet, the expert witness testifying in court need not be the person who actually compiled the statistics or data for comparison; he or she may rely on data prepared by others. See State v. Pooler, 96-1794 (La.App. 1 Cir. 5/9/97), 696 So.2d 22, 55, writ denied 97-1470 (La.11/14/97), 703 So.2d 1288. Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. See Rogers v. Roch, 95-242 (La.App. 5 Cir. 10/18/95), 663 So.2d 811, 817, writ denied 95-2769 (La.1/26/96), 666 So.2d 678.. Nevertheless, if the expert opinion is so fundamentally unsupported that it can offer no assistance to the jury, then the testimony can be rejected. See Rogers, supra.

a. Use of Medical Records for cross-examination
LSA-C.E. art. 703 entitled "Bases of opinion testimony by experts," provides the following:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
According to the record, Dr. Carroll testified that an accurate medical history from a patient is an important aspect of a physician's quest to properly treat and medicate that patient for his or her medical problems. It was at this point that Prudential proceeded to question Dr. Carroll about whether he knew of the information that was included in the medical records for C. Barre and Legaux from the physicians who had examined them prior to their visit with him in July of 1996. Once Dr. Carroll testified that he was not familiar with his patients' previous medical complaints or their involvement in other automobile accidents, Prudential, for crossexamination purposes, presented him with their prior medical records in an attempt to determine whether this information would have been important in his diagnosis of their injuries. Therefore, in light of Dr. Carroll's testimony during direct examination, we find that it was relevant for Prudential to cross-examine Dr. Carroll regarding the discrepancies in the medical histories for C. Barre and Legaux.
We also find that the plaintiffs' reliance on Waterman v. Colonial Penn Ins. Co., 95-1578 (La.App. 4 Cir. 12/28/95), 666 So.2d 699, is misplaced. In Waterman, this Court held that the trial court's decision to not allow the defendants to crossexamine the plaintiffs expert about entries in another physician's reports was not abuse of discretion. Also, in Waterman, this Court held that the conduct of a trial proceeding is purely discretionary with the trial court; therefore, unless the process is abused the reviewing court will not reverse the trial court's decision.
Unlike the case at bar, the defendants in Waterman wanted the testifying physician to comment on the medical records prepared by another physician. However, the record in this case reflects that Prudential intended to establish for the record that there existed information that was known to the plaintiffs' previous physicians but not disclosed to Dr. Carroll by either C. Barre or Legaux before he made his diagnosis.
Furthermore, neither LSA-C.E. art. 703 nor Waterman prohibits the trial court from allowing an expert to be questioned about data or information from another expert's reports. Therefore, we find that *73 it was not an abuse of discretion for the trial court to allow Prudential to cross-examined Dr. Carroll about the importance of the information in the plaintiffs' prior medical records to his overall diagnosis.
Additionally, the issue of whether these medical records were certified on the date of trial is immaterial since plaintiffs' counsel was served with a Notice of Records Deposition, and was aware that Prudential requested certified copies of the plaintiffs' medical records prior to trial.

b. Mistrial
As we mentioned above, the conduct of the trial is within the discretion of the trial court, and that discretion is subject to review only for abuse of that discretion. LSA-C.C.P. art 1631; see Balashov v. Baltic Shipping Co., 96-1129 (La. App. 4 Cir. 1/22/97), 687 So.2d 1101, writ denied 97-0487 (La.4/18/97), 692 So.2d 449. Generally, courts have accepted that a mistrial is a dramatic remedy; therefore if no other remedy is available for the factfinder to consider in reaching an appropriate verdict then a mistrial would be proper. Vicknair v. Dimitryadis, 93-0003 (La.App. 4 Cir. 1/13/94), 640 So.2d 275, 278. In this case, we find that the trial court had other alternatives available to it other than ordering a mistrial. Here, the trial court gave both C. Barre and Legaux the opportunity, following Dr. Carroll's testimony, to explain or clarify why certain information was not given to Drs. Carroll, Hoerner and Butler. Also, the trial court, during recess, ordered Prudential to reissue a subpoena for a certified copy of Legaux's medical records so that it can determine whether the records were for Legaux. When it was proven that the records were for Legaux, the trial court allowed Prudential to cross-examine Dr. Carroll. Hence, we cannot say that it was error for the trial court to take such measures to avoid a mistrial. Therefore, we find no merit to the plaintiffs' request for a mistrial based on Prudential's use of Legaux's medical records.

JUROR MISCONDUCT
In their final assignment of error, C. Barre and Legaux argue that the trial court erred in not granting their Motion for a New Trial in light of their allegation of juror misconduct. They argue in their briefs that they overheard two female jurors and Prudential's lead counsel discussing whether or not the jurors remembered her from a prior unrelated function. They argue that the conversation Prudential lead counsel had with two women constituted grounds for a new trial since neither of the women admitted to knowing either plaintiffs' counsel or defense counsel during voir dire.
Prudential, in rebuttal, argues that the conversation between defense counsel and the two female jurors was not of such character as to give support to the allegation of juror misconduct. Further, there was no showing of undue influence by the defense upon the jury either before or after the verdict was rendered. Prudential further argues that the conversation between defense counsel and the two jurors took place when the jury had been discharged of their duty. Therefore, a new trial was not warranted. We agree.
LSA-C.C. art. 1972 provides that the trial court has the discretion to grant a new trial for jury misconduct when the jury was either bribed or behaved improperly so that impartial justice has not been done. (Emphasis added). Though the grant or denial of a motion for a new trial rests within the discretion of the trial judge, the reviewing court must still evaluate the trial court's decision under the manifest error clearly wrong standard of review. Uriegas v. Gainsco, 94-1400 (La.App. 3 Cir. 9/13/95), 663 So.2d 162, writ denied 95-2485 (La.12/15/95), 664 So.2d 458. Improper behavior by a juror or jury is not defined; therefore, the facts and circumstances of each particular case must be reviewed to determine whether said behavior was improper, and the trial courts as well as the reviewing courts must *74 not overlook the behavior as being insignificant. Id.; cf. Zatarain v. WDSU Television, Inc., 95-2600 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181.
In this case, the trial court allowed the jurors to speak with both counsel of record since trial had ended and the court had discharged them. Further, there was no indication in the record or briefs that the conversation between the jurors and defense counsel centered on issues that were discussed during trial or during jury deliberation. Without any evidence to the contrary, we find no error in the trial court's decision to deny the motion for a JNOV or new trial based upon juror misconduct.

DECREE
For the foregoing reasons, we hereby affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Classic Syndicate, Inc., was subsequently severed from this lawsuit on March 3, 1998, as a result of a stay order from the Circuit Court of Marion County, Indiana.
[2] Chronic low back pain has been defined as consistent pain which last for a least three months.
[3] Dr. Carroll explained that degenerative disc disease occurs when the body begins to deteriorate from the ordinary wear and tear on the flexible parts of the body, including the back and neck regions. It is also described as disc dehydration, which refers to the process where the disc begins to lose water and harden thereby making the spine stiff and making certain movements or positions painful. He testified that the process usually begins when an individual is in his twenties and is only visible in MRI film. He also testified that most people would show signs of the disease in the late forties, even though they may not be suffering from any type of pain or discomfort.
[4] According to the trial transcript, C. Barre was involved in a previous accident in May of 1996, whereby he sustained injuries to his neck and shoulder, but C. Barre denied having any back pain.
[5] In the record, Dr. Carroll testified that a herniated disc can occur without causing the person to have back pain. Further, he explained that when a herniated disc is protruding it could press on an adjacent nerve and cause pain to radiate down the legs. If the herniated disc does not press up against a nerve root then it is called local pain, meaning pain that restricts motion.
[6] Dr. Hoerner testified that if the amount of millimeters from the annulus was five or more then it is classified as a herniation.
[7] Dr. Butler's testimony was limited to his evaluation of Wayne Legaux only.