815 So.2d 143 (2002)
Sidney GLASS & Frances Glass
v.
The MAGNOLIA SCHOOL, INC., Brenda Walker, Nicole Webre and Transcontinental Insurance Company.
No. 01-CA-1209.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 2002.
Writ Denied June 7, 2002.
*145 Clarence F. Favret, III, New Orleans, LA, for Appellant.
Gwendolyn S. Hebert, New Orleans, LA, for Appellees.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and MARION F. EDWARDS.
EDWARDS, Judge.
Plaintiff Mrs. Frances Glass appeals a jury verdict in favor of the defendants Nicole Webre, Brenda Walker, Magnolia School and its insurer Transcontinental Insurance Company. For the following reasons we reverse the jury verdict and render judgment in favor of Mrs. Glass.
Mrs. Glass and her husband filed suit in the Twenty Fourth Judicial District Court against The Magnolia School for damages sustained due to the death of Mrs. Glass's son, Wayne. Wayne was a 32 year-old mentally retarded adult residing at Magnolia when he suffered a near-drowning accident on August 1, 1997. After being rescued from the pool, he was taken to Ochsner Foundation Hospital where he subsequently died several days later. The petition was amended to include Ms. Brenda *146 Walker, a teacher, and Ms. Nicole Webre, a lifeguard, both employees of Magnolia, as defendants. Mr. Glass, Wayne's stepfather, later dismissed his own cause of action, and passed away prior to the trial of the matter.
A jury trial was held in June of 2001. Following presentation of the evidence, the jury returned interrogatories finding no negligence on the part of any of the defendants. The trial court denied a motion by Mrs. Glass for a Judgment Notwithstanding the Verdict. Mrs. Glass appeals the jury findings.
Nicole Webre was the lifeguard on duty on the day Wayne drowned. She was certified by the YMCA in a Red Cross program. She testified that there were normally two lifeguards on duty, but that she had been informed by the other lifeguard that he would not be working that day. In the past, in such situations there have been substitutes, but they had decided that it was a short day, and that only one of them would be sufficient. There was always another school employee, in this case the house mother Brenda Walker, watching the students. The water was clear, and there were four other students in the pool besides Wayne. Nicole's chair was at mid-pool, a couple of steps from the edge, so that she could see everyone, and she could see the bottom of the deep end. It was not an elevated chair. There was a rope in the pool dividing the deep and shallow ends. On that day, Ms. Walker was sitting catercorner to Nicole's left, and another student named Darryl was sitting next to her.
The groups at the school would swim from 45 minutes to an hour, two or three times a week. There were good swimmers, among them Wayne, who was excellent. Nicole customarily scanned the pool, from one end to the other, every ten seconds. It was Wayne's habit to go into the water, float for a while, and then swim underwater from one end to the other. He would come up for air, then swim back underwater, occasionally stopping to chat with the other students. He was doing this on the day he drowned. Two students in the shallow end of the pool to her right were roughhousing and Nicole verbally corrected them. She scanned the pool, looking left to right then left again as she saw Darryl staring intently into the deep end, Nicole jumped up to look and saw Wayne, at that point a purplish blue, inert at the bottom with his back turned up. She jumped in, and pulled him to the shallow end to get him out. She began rescue breathing, and a froth came out of his mouth. The school nurse, Ms. Yolanda Jones (also referred to in the record as Yolanda Lambright), came and got him breathing again, at which time a bloody substance came out of his mouth.
After the EMT's came, Nicole was told to write a report. She originally stated in that report that Wayne had been floating for a few seconds, then changed it to "an unknown number" of seconds. At trial, she stated several times that she had last seen Wayne 20-30 seconds before finding him at the bottom, although in her deposition she stated that she could not recall the last time she saw Wayne before he was found. Ms. Webre never saw Wayne struggle nor did she hear him make any noises.
Brenda Walker, a Residential Training Specialist at Magnolia for fourteen years, testified that she was the "house mom" in the house where Wayne lived at Magnolia. When taking her charges to the pool, she usually sat on the opposite side of the pool from the lifeguard, keeping a general eye on everyone. One of her duties was to maintain close visual supervision of her clients at all times. She had taken the six residents to the pool that day. Two of *147 them were not swimming, but were sitting with her. The other four were all good swimmers. Usually, in the last fifteen minutes of swimming she would notify the students every five minutes of how much time was left.
They arrived late at the pool that day and at around a quarter to five, another student, Denise, left the pool with her resident assistant. Wayne didn't want Denise to leave, and was bargaining with Ms. Walker for more swimming time. At about five minutes to five, the assistant returned to retrieve an item she had left. The nurse, Ms. Yolanda Jones, was passing by and Wayne began "flirting" and talking to her. At that time, the argument between the other two students erupted, and her attention focused on them. She was talking to the students who were "getting out of hand" and "about to get into it", and this caused her to lose visual contact with Wayne for about three minutes. She heard, but did not see Wayne, when there were about two minutes left to swim. One of the students sitting with her, Darryl, was to judge the last lap. Ms. Walker was picking up towels and walked toward the deep end, where she saw Wayne under the water. She yelled for the lifeguard and the nurse, then ran to get Security to call 911. Ms. Jones had not left the premises. Ms. Walker took the rest of the students back to the house. Although she did not see Wayne for five minutes before discovering him, she was certain that she heard his voice two minutes before he was found.
The deposition of Yolanda Jones (Lambright) was admitted in lieu of her testimony. Ms. Jones is an Licensed Practical Nurse employed at the time of the accident at Magnolia. At the time Wayne was pulled out of the pool, she was walking nearby to give medications at another cottage, and noticed the commotion as the lifeguard struggled to get Wayne out. She had not passed the pool earlier that afternoon and did not walk past outside the gates. When the victim was out of the pool, Ms. Jones asked the lifeguard how long Wayne had been under and was told "about ten seconds." Ms. Jones looked at Ms. Webre, because Wayne was too blue, from head to toe, to have been under just ten seconds. He was not breathing and was unconscious, although he had a pulse. She gave him rescue breaths, and he began to breathe. Ms. Jones turned Wayne over in the rescue position; phlegm mixed with blood came out of his mouth. Shortly afterwards, the other nurse on duty, Ricky Hebert, came in. The ambulance arrived quickly, and Wayne's color slowly began to return as he breathed very shallowly. She did not know any medications which Wayne had been taking, but had brought his chart to the hospital in the ambulance. She remained at the hospital until about 10:00 p.m.; no other Magnolia employees were there.
Charles Bower, testifying on behalf of the plaintiff's, was qualified as an expert in the area of life guarding and water safety. He reviewed photos of Wayne and of the Magnolia pool; he also reviewed Ms. Webre's personnel file, Wayne's medical chronology, the Jefferson Parish Fire Services report, depositions of Ms. Walker, Ricky Hebert, Yolanda Jones, and other witnesses. He further read the reports of Dr. Modell and Dr. Neuman.
In his opinion, a lifeguard has a duty to guarantee the safety of all bathers, and those with mental disabilities require much more attention. After reading all of the documents available to him, Mr. Bower believed that the lifeguard in this case was distracted for a period of time long enough to cause serious injury to Wayne. He based his conclusion on her statement, which she "changed immediately ..." as well as on testimony of other eyewitnesses. *148 One "attentive, uninterrupted lifeguard, but not distracted in any way" was capable of supervising four to six people in a pool that size, doing the duty the way she was trained, that is, to scan the pool every ten seconds. "It's impossible for a drowning to occur in a pool with clean water if the Life Guard is doing his or her job correctly."
There is a "ten and ten" rule in the YMCA life guard manual, which is to recognize a problem within ten seconds and get the victim to where they can breathe within ten seconds. In the pool such as at the Magnolia, an attentive life guard would be able to respond in much less then ten seconds. The higher the life guard sits, the better he can see what is going on under water. It would be appropriate for Ms. Webre to stop to admonish the unruly students, if she were still able to scan the pool within the ten second goal.
Dr. Jerome Modell testified on behalf of the plaintiffs. Dr. Modell is Professor Emeritus of Anesthesiology and Professor of Large Animal Clinical Sciences at the University of Florida, and was qualified as an expert in the fields of anesthesiology, critical care medicine, and of drowning and near-drowning. He reviewed the depositions of witnesses at the scene, and the medical records of the emergency services and hospital treatment. He also reviewed a letter from the defense expert Dr. Neuman. Dr. Modell testified that within a reasonable medical probability, Wayne was under water for 2-3 minutes. He compared the physiologic response of the victim with the scientific studies in order to determine the length of time. Dr. Modell described the best studies as having been done by a Dr. Cot, who experimented with animals, specifically, dogs. It was determined that when submerged, the animals briefly hold their breath, then go through an involuntary process called a laryngospasm. In this process, when water gets to the back of the throat and nose, the vocal cord shuts to protect the lungs. The process cannot be stopped until the oxygen level gets so low that the reflex is lost. From the time the victim is submerged until the laryngospasm breaks, approximately a minute and a half to a minute and fifty seconds, the victim does not breathe. Then water is aspirated into the lungs. After three minutes, the heart stops. With people who hyperventilate or voluntarily hold their breath, the time before laryngospasm may be somewhat prolonged. Dr. Modell has worked with over one hundred drowning victims, treating them at various stages including those who went into full cardiac arrest. He also did extensive animal studies. The data is compatible with Dr. Cot's experiments, although Dr. Modell knew of no experiments to confirm how long laryngospasm lasts in humans. As a professor of large animal studies, he testified that pound for pound, the larynx in a dog is a little larger than that of a human, but the structure and response to laryngospasm is basically the same.
The time Wayne lacked oxygen included the time it took to rescue him and get him breathing. However, Dr. Modell based his estimate of the time Wayne was underwater on the amount of water aspirated.
Because Wayne did have a heartbeat, he could not have been underwater more than three minutes. The frothy pink foam shows that he aspirated water, so he had to have been in the water for at least a minute and a half. Medical tests such as his serum sodium level, serum chloride level, and oxygen level are compatible with having aspirated well over one-half liter of water. For Wayne's entire body to be blue he had to have deprived of oxygen for more than one minute. If Wayne had a *149 seizure, it would not effect the process of laryngospasm.
Dr. Tom Neuman, a doctor at the Medical School at the University of California in San Diego, runs the hyperbaric chamber at the university. He was qualified as an expert in internal medicine, pulmonary disease, occupational medicine, undersea hyperbaric medicine and emergency medicine. The key to his opinion was the testimony of Ms. Walker and Ms. Webre on the period of time for which Wayne was unaccounted. Dr. Neuman concluded that Wayne suffered a relatively moderate near-drowning episode, because he was able to breath after six rescue breaths and was awake. Near drowning can be as mild as coughing a lot or as serious as a victim in cardiac arrest who is resuscitated. "Delayed death subsequent of near-drowning" is almost invariably due to a prolonged period being underwater, which leads to brain damage.
If one is exercising very heavily and not replenishing oxygen, he could turn blue in 20 seconds or less. There are a variety of circumstances under which people will aspirate water almost immediately. Within a twenty second period, a person could aspirate water into the lungs; with spear-fisherman, they can hold their breath until they lose consciousness, then immediately aspirate water. Some people have reflexive inhalations for 10-15 seconds after their heart stops. In his opinion, laryngospasm is a hypothesis to account for the period of non-breathing associated with immersion in water; Dr. Cot's experiments did not conclusively demonstrate laryngospasm, and, in Dr. Neuman's opinion, it is not the operative feature for most near drownings. Cot's studies showed that the dogs aspirated water in fifty to seventy-five seconds. According to Dr. Neuman, lower animals may hold their breath longer, and age and species makes a difference. Other studies indicate that non-breathing may not be due to laryngospasm.
From the time Ms. Walker talked to Wayne and then began picking up the towels, whether the period of time was twenty or thirty seconds doesn't matter in Dr. Neuman's opinion. Some extreme exertion made Wayne turn blue in that period of time to render him incapable of swimming, struggling, etc. and caused him to aspirated a large amount of water without having a terrible neurologic effect. Eliminating other causes such as a diabetic blackout or heart attack, a "tonic clonic" seizure would explain the "intense physical activity" to cause a loss of consciousness in a brief period of time. Although Wayne had never before had a seizure, nothing else explains the facts which Dr. Neuman found. All of this was "very heavily dependent" upon the time frame given by Ms. Walker and Ms. Webre.
On cross-examination, Dr. Neuman stated that if Ms. Webre didn't know how long Wayne was underwater or that Ms. Walker had no contact with him was five minutes, his theory was 90% "blown away." Dr. Neuman agreed that the principal diagnosis was near-drowning and that ultimately, Wayne died of those injuries. In the "tonic clonic" seizure, the body contracts, the limbs become stiff; then the convulsive stage begins. If this stage began while Ms. Webre and Ms. Walker were looking directly at him, they would have seen Wayne go rigid. Because Wayne was limp when discovered, the seizure would have been over.
Dr. Charles Sea, an emergency room physician at Ochsner, testified that when Wayne arrived at the hospital he was cyanotic, but was breathing on his own. Although the paramedics had given him oxygen, he was still low on oxygen and was in respiratory distress. Coarse bronchi indicated *150 fluid in the lungs, and there were rales. His abdomen was extended indicating that he had swallowed water. A chest x-ray showed infiltrates in both lower lungs. An endotrachial tube was placed in his throat and he was catheterized, sedated, and placed in soft restraints. Blood gas tests showed that he was hypoxic, with his oxygen saturation being 68% rather than the norm of 80-90%. He was eventually moved to ICU.
Dr. Warren Summer was qualified as an expert in the fields of internal medicine, pulmonary and critical care medicine. A physician at Ochsner, he was generally familiar with Wayne's treatment at the hospital. In his opinion, the complications and injuries to Wayne's lungs which ultimately resulted in his death were caused by the near-drowning. When Dr. Summer saw Wayne, the patient was very agitated. He had abnormal, harsh, breath sounds. Wayne suffered from hypoxia (low blood oxygen) and hyponatremia (dilution of body salts). He had aspirated water, and had developed pulmonary edema; Wayne was intubated, sedated, and mechanically ventilated. He developed acute respiratory distress syndrome (ARDS), and later developed fever due to pneumonia. He had developed a collapsed lung, but eventually he was weaned off the ventilator. He remained agitated, and was given sedatives, as well as morphine for pain. Wayne was doing well, and then something happened, he "went down" very rapidly. As it turned out, both lungs collapsed, Wayne went into shock but after forty-five minutes of resuscitation efforts, he could not be revived. Dr. Summer did not know if he was able, through medication, to eliminate pain and suffering, and did not remember if Wayne was conscious after he was removed from the ventilator.
Floyd Glass, brother of Sidney Glass, testified that his late brother Sidney and Mrs. Glass often visited Wayne at school, and that Wayne frequently came home for visits. Wayne was a happy person, and his mother missed him when he was at school. Wayne's death has had a tremendous impact on his mother.
Connie Rauch, a neighbor of Mrs. Glass, testified that she knew Mrs. Glass and Wayne, and saw them embrace when Wayne was at home. Wayne would go to her house for birthday parties and was very talkative. Since his death, Mrs. Glass misses him terribly and is depressed. Stephen Rauch testified that he saw Wayne at home at least twice a month, and that Wayne would play with the animals and walk in the garden. Mrs. Glass has been deeply affected, and has never recovered from Wayne's death.
Wilbert Wilson, a friend, often visited the Glass house when Wayne was at home. Wayne and his mother had a very loving relationship, and Wayne loved to go to parties and play in the yard. Wayne's loss was terrible for her, because she had doted on him.
Mrs. Glass testified that Wayne was her only child. She married Mr. Glass when Wayne was 11 or 12 years old; he was not Wayne's biological father. When Wayne was 15 or 16 he went to Magnolia. Mr. and Mrs. Glass picked him up every two weeks at first, but later, because of Medicare changes, picked him up every three weeks and brought him home to Madisonville. She first learned that Wayne was injured when a security guard called and told her that Wayne had hit his head; she was not told about the near drowning. When she saw him, he was in restraints, with tubes in his nose and mouth. He was not awake. Because he was in ICU, she could only visit him for 20 minutes at a time, and did so at every opportunity each day. He remained in the restraints, and could not talk because of the tubes. At *151 times he seemed anxious, irritable, in pain, and afraid. He had trouble breathing and coughing. When Mrs. Glass went in to Wayne's room on the morning he died, Wayne just had the oxygen mask. He was trying to talk, when he started coughing and breathing really hard. The nurse made her leave the room, and some time later the doctors told her that Wayne had passed away. She "went to pieces." Wayne was a loving child in a man's body, and she missed him when he was at school. When he was at home, she would take him out; he would play with the family, such as with her husband's grandchildren and great-grandchildren. Wayne had different jobs at school. Mrs. Glass had outings at her home for some of the Magnolia students. She is lost without him.
The autopsy performed on Wayne involved only his heart and lungs. His death certificate showed the cause of death to be tension pneumothorax, pneumonia, Adult Respiratory Distress Syndrome, and near-drowning as a result of the pool accident.
Following trial, the jury returned a verdict finding no negligence on the part of any of the defendants.
In the first assignment of error, Glass alleges that the trial court erred in denying her Motion To Strike The Jury. Briefly, after Magnolia requested a jury trial, it estimated that the trial would take three days and pursuant to the court's order, posted a cash bond of $900.00 in August of 1999. The trial was continued several times, and in January, 2001, the parties agreed that the estimated time of trial should be increased to five days. The Status Conference Order stipulated that the cash deposit in the amount of $300.00 per day must be filed no later than thirty days prior to trial, which was set to begin on June 11, 2001. On May 30, 2001, Glass filed a Motion To Strike Jury because the additional $600.00 had not been paid. On June 1, 2001, Magnolia deposited the additional funds and the motion was denied. On June 15, the day after the last day of trial, Glass filed a Motion For New Trial on the denial of the motion to strike, which was denied.
Glass correctly states that La. C.C.P. Art. 1734 requires the bond in a jury trial be filed no later than thirty days prior to trial, and that failure to timely do so will result in the loss of the statutory right to trial.[1] However, the law is clear that when the court grants or denies a jury trial, the objecting party cannot wait until a verdict and then decide whether to appeal; he must complain prior to trial, either by application for writs or other appropriate means.[2] Glass did not take these measures in the present case, but only moved for new trial on the motion after the trial on the merits. If the trial court erred, which we expressly do not determine, by failing to take appropriate action in this court prior to trial, Glass is held to have acquiesced in the granting of the jury trial or to have waived her right to object to it.[3] Under these circumstances, we find no reversible error in the ruling allowing the jury trial to proceed.
Glass also urges that the jury erred in not finding Magnolia guilty of negligence. We agree.
The Supreme Court has frequently noted the task of the appellate *152 court on reviewing a judgment and/or civil jury verdict, instructing us that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong.[4] Although we accord deference to the factfinder, we have a constitutional duty to review facts not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support.[5] The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.[6] The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.[7] The reviewing court must always keep in mind that if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.[8]
The duty-risk analysis to be undertaken by the trier of fact is equally well settled. To determine whether a plaintiff may recover damages under La. C.C. art. 2315, courts traditionally employ a duty-risk analysis, which requires affirmative answers to the following questions:
1) Was the conduct in question a cause-in-fact of the resulting harm?
2) Did the defendant owe a duty to the plaintiff?
3) Was the duty breached?
4) Were the risk and the harm caused within the scope of protection afforded by the duty breached?[9]
The conundrum to be resolved in this case, insofar as it is possible, is a conclusion of exactly what happened to Wayne in the pool. The undisputed facts proven by Glass are that Wayne suffered a near-drowning, and ultimately died from the injuries he sustained as a result of that accident. Why, and how long, he was underwater, is at the heart of a determination of fault here.
It appears that from the evidence presented, the jury believed that Wayne was underwater for twenty to thirty seconds prior his discovery at the bottom of the pool. Granting the jury its due province of fact-finding and credibility determination, it is nevertheless clear from the record in its entirety that such a conclusion was unreasonable and without evidentiary support.
To the extent the jury relied on the testimony of Ms. Walker, that testimony is seriously flawed, and even if credible, does *153 not resolve the issue at hand. She stated that Ms. Jones was walking outside the fenced area at a few minutes before five, and that she heard Wayne talking to Jones. Ms. Jones herself testified that she was not near the pool earlier and would not have been walking outside of the fenced area anyway. Such stark discrepancy calls the remainder of her recollection, particularly the time element as to when she heard Wayne's voice, into question. It is undisputed that she had no visual contact with Wayne for at least five minutes, and even according to her own testimony, no auditory contact for two minutes. Thus, even if her testimony were correct in that regard, Wayne's whereabouts in the pool was unknown to her for at least two minutes. Even so, according to Ms. Walker's testimony, the altercation between the two students continued directly in front of Ms. Webre, diverting her (Walker's) attention for about three minutes.
The record also evidences problems with Ms. Webre's testimony relative to the time element. Although she stated at trial that she had last seen Wayne twenty to thirty seconds before he was found, she told Ms. Jones during resuscitation attempts that Wayne had been under for only ten seconds; on her report, she first wrote that he was floating on the bottom of the pool for a few seconds, then scratched that out and wrote in "an unknown amount of seconds." Her confusion as to the time element is evidenced in her deposition, where she stated that she could not recall the last time she had seen Wayne before discovering him at the bottom of the pool, and could not give an estimated time. She scratched out on her written report because "I remember thinking, I don't remember you know Inot that I don't remember. I don't know how long." It is clear from her testimony that the twenty to thirty second estimate to which she testified at trial was based on her customary practice, rather than from actual recollection.
Even more troubling is the conclusion drawn by Dr. Neuman based on the twenty to thirty second time frame. The key to his opinion that Wayne had a seizure which precipitated his near drowning was the time frame testified to by Ms. Walker and Ms. Webre. As we appreciate Dr. Neuman's testimony, if Wayne was under water for only twenty to thirty seconds as per Ms. Webre and Ms. Walker, by excluding other possibilities only a seizure would account for his extreme hypoxic state. "Something ... had to have such extreme exertion that it make him turn blue in that period of time, and it had to render him incapable, because he's a good swimmer ... further, it had to cause him to aspirate what was a seemingly large amount of water ..." Dr. Neuman himself did not provide an estimated time of immersion, nor offer his hypothesis as a reasonable medical probability. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.[10] Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record.[11]
*154 In the present case, the record is devoid of any evidence that Wayne had a history of seizures, that he had ever suffered from any condition causing seizures, or that he had, in fact, ever experienced one. In short, Dr. Neuman had no more evidence on which to postulate a seizure than he did in ruling out diabetic blackout or heart attack. Because Magnolia presented no evidence that Wayne suffered from any conditions which would cause him to suddenly lose consciousness, Dr. Neuman's opinion was speculative at best. It has been held that a factfinder may not infer the existence of a defect based on the fact that an accident has occurred.[12] Analogously, we hold that a factfinder may not infer the existence of one medical condition based solely on the lack of another explanation for an occurrence. To the extent that it did so, it was error for the jury to assign much weight to Dr. Neuman's conclusion.
Dr. Modell based his opinion largely on the results of tests and medical information from the emergency room treatment, particularly on the amount of water that Wayne aspirated. Magnolia points out that Dr. Modell's estimate of the time Wayne lacked oxygen included his rescue and resuscitation. However, Dr. Modell pointed out that he based his opinion of how long Wayne was underwater, which is the central fact at issue, on evidence of the objective medical tests showing water in Wayne's lungs and abdomen, his blood gases, etc. Additionally, it was Ms. Webre's testimony that Wayne was already a purplish blue by the time she saw him underwater. The evidence in the record as a whole preponderates toward the conclusion that Wayne was underwater for at least two minutes.
The next question to be resolved is whether there was a breach of duty.
With regard to the duty owed by Magnolia to Wayne in the present case, we think it clear that it is the same duty owed to any children in school. The testimony evidenced that Wayne had the mental capacity of an eight year old. Temporary custodians of children, such as school personnel and day care workers, are charged with the highest degree of care towards the children left in their custody; supervisors must follow a standard of care commensurate with the age of the children under the attendant circumstances.[13] Although charged with the highest degree of care toward children placed in their custody, supervisors at schools are not absolute insurers of the children's safety. Liability is imposed only where there is a causal connection between the lack of supervision and the accident that could have been avoided by the exercise of the required degree of supervision.[14] In the present case, considering the physical and mental disabilities of its students, Magnolia had the obligation to supervise the swimmers in their charge with a sufficiently high degree of care so as to guard against injuries resulting from the use of the pool.
Further, it has been recognized that the duty of care a lifeguard owes is more than the standard of care required of ordinary *155 persons. A lifeguard, by training and experience, is expected to be prepared at a moment's notice to rush to the rescue of those in danger of drowning. His is not an obligation which can be discharged by inattention to the activity in the pool and a lack of the awareness of the serious nature of the responsibility imposed upon the position.[15]
In this case, there were two Magnolia employees, Ms. Walker and Ms. Webre, supervising six residents, only four of whom were actually in the pool, and who were swimming for only fifteen minutes. At least one of them, paying reasonable attention commensurate with the situation and the mental age of the residents, should have been able to discover Wayne in extremis within two to three minutes. Had Darryl not seen Wayne, it is uncertain how much longer he might have stayed immersed. Under these circumstances, Ms. Walker, Ms. Webre, and Magnolia, through its employees, breached the standard of care owed to Wayne. Because there is a clear causal connection between the failure of the employees to act in a reasonable and prudent manner and the risk of harm suffered by Wayne, liability should have been imposed on the defendants.
If the fact finder does not reach an issue because of an earlier finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of undecided issues from the facts presented in the record.[16]
We find from the record that Ms. Walker and Ms. Webre were equally at fault in failing to act reasonably to protect Wayne, and each is assigned 50% of the fault. Under La.C.C. art. 2320: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
Liability is imposed upon the employer without regard to his own negligence or fault; it is a consequence of the employment relationship.... The employer's liability is secondary or derivative in the sense that the employer is not himself a wrongdoer or tortfeasor....
Although the employer and employee are not joint tortfeasors, they are nonetheless each obligated for the same thing total reparation of the damages to the victim. The derivative nature of the employer's liability is of no concern to the victim, and he can compel either the employer or the employee to compensate him for the whole of his damages.[17]
Crucial to application of article 2320 is a finding that when the employee committed the tortious act, he was working "in the exercise of the functions in which... employed." Each case must be decided on its merits to determine whether the conduct is to be regarded as within the scope of the employee's employment.[18] Because Ms. Weber and Ms. Walker were clearly in the scope of their employment, Magnolia is legally responsible for the damages caused under the doctrine of respondeat superior.
*156 Because the jury failed to reach the issue of damages, we must set an appropriate damages award based on the record. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by the record.[19] There is no mechanical rule for determining general damages; the facts and circumstances of each case control.[20]
We have carefully read the record and have determined that Mrs. Glass has suffered the loss of her only child as if he were indeed, an eight year old, yet she was his mother for over thirty years. Her affecting testimony, as well as that of friends who knew the Glasses, evidenced that although Wayne lived at Magnolia, he frequently stayed at home and was an integral and beloved part of family life. Although such loss cannot be measured in monetary terms, we determine that a general damage award to Mrs. Glass of $100,000.00 is appropriate.
During the several days Wayne spent in the hospital, it is clear that he was in pain, and although unable to speak, communicated his fear and pain to his doctors by acting in such a manner so as to require restraints. The description of his physical condition when he was rescued through the time of his death evidences that, among other things, he was in acute respiratory distress, and was partially paralyzed in order to be intubated; physicians inserted an NG tube, emergency chest tubes and a catheter. He was placed on a ventilator and suffered cardiac arrest. We find that an award of $50,000.00 is appropriate for his pain and suffering.
Prior to trial, the parties agreed that the medical expenses of $22,247.95 would be adjusted according to payments made by Medicaid, to the final amount of $7,214.32. We therefore award the amount of $7,214.32 for medical expenses. Admitted into evidence were bills of Wayne's funeral expenses in the amount of $4,941.19, which amount we also award.
Accordingly, for the reasons expressed herein, we reverse the trial court and find that Magnolia School, through its employees Ms. Walker and Ms. Webre, is liable to Mrs. Glass for $100,000.00 in general damages, plus $7,214.32 in medical expenses, and $4,941.19 funeral expenses. Magnolia is liable to Mrs. Glass on behalf of Wayne for $50,000.00, all plus interest from the date of demand, and for all costs of the proceedings in the trial and appellate courts.
REVERSED AND RENDERED.
NOTES
[1] See Holmes v. Peoples State Bank, 35,072 (La.App. 2nd Cir.9/26/01), 796 So.2d 176.
[2] Id.; Brown v. General Motors Corp., 95-245 (La.App. 5 Cir. 10/18/95), 662 So.2d 531, writ denied 95-3034 (La.2/16/96), 667 So.2d 1055; Windham v. Security Ins. Co. of Hartford 337 So.2d 577, (La.App. 4 Cir.1976), writ denied 341 So.2d 407 (La.1977).
[3] Brown v. General Motors Corp., supra.
[4] Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State, [Through] Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
[5] Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; LaBove v. Raftery, 00-C-1394 c/w 00-C-1423 (La.11/28/01), 802 So.2d 566, 2001 (citations omitted).
[6] LaBove v. Raftery, supra.
[7] Id.
[8] Id.
[9] Millet v. Treasure Chest Casino L.L.C., 00-1843 (La.App. 5th Cir.5/30/01), 788 So.2d 713, writ denied XXXX-XXXX (La.10/5/01) 799 So.2d 485.
[10] Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990); Rogers v. Roch, 95-242, p. 16 (La.App. 5 Cir. 10/18/95), 663 So.2d 811, 817-818, writ denied, 95-2769 (La.1/26/96), 666 So.2d 678.
[11] Rogers v. Roch, supra; Davis v. Sonnier 96-515 (La.App. 3rd Cir.11/6/96), 682 So.2d 910,
[12] Jurls v. Ford Motor Co. 32,125 (La.App. 2nd Cir.1/6/00),752 So.2d 260; Jaeger v. Automotive Casualty Insurance Co., 95-2448 (La. App. 4th Cir.10/9/96), 682 So.2d 292, writ denied, 96-2715 (La.2/7/97), 688 So.2d 498.
[13] Bell v. USAA Cas. Ins. Co. 30,172 (La.App. 2nd Cir.1/21/98), 707 So.2d 102, writ denied 98-0712 (La.5/8/98), 718 So.2d 433; Drueding v. St. Paul Fire & Marine Ins. Co., 482 So.2d 83, (La.App. 4th Cir.1986).
[14] Glankler v. Rapides Parish School Bd., 610 So.2d 1020 (La.App. 3 Cir.1992), writ denied, 614 So.2d 78 (La.1993); Hunter v. Caddo Parish School Bd., 627 So.2d 772, (La.App. 2 Cir.1993).
[15] Williams v. City of Baton Rouge, 214 So.2d 138, 252 La. 770, (La.1968).
[16] Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742,(La.1995); LeBlanc v. Allstate Ins. Co., 00-1128 (La.App. 5th Cir.11/28/00), 772 So.2d 400.
[17] Griffin v. Kmart Corp. 00-1334 (La.App. 5th Cir.11/28/00), 776 So.2d 1226, citing Sampay v. Morton Salt Co., 395 So.2d 326, 328 (La.1981).
[18] Griffin v. Kmart Corp., supra.
[19] LeBlanc v. Allstate Ins. Co., supra.
[20] LeBlanc v. Allstate Ins. Co., supra; Kose v. Cablevison of Shreveport, 32-855 (La.App. 2nd Cir.4/5/00), 755 So.2d 1039.