S.K., J.B. ON BEHALF OF THE MINOR CHILD H.B.
v.
CATHOLIC DIOCESE OF BATON ROUGE AND A.M., JR. AND C.M.[1]
No. 2007 CA 0742.
Court of Appeals of Louisiana, First Circuit.
December 21, 2007.
NOT FOR PUBLICATION.
LEWIS O. UNGLESBY, ROBERT M. MARIONNEAUX, Jr., SAMUEL C. WARD, Jr., Counsel for Plaintiffs/Appellants, S.K. and J.B. on behalf of the minor child, H.B.
DANIEL R. ATKINSON, Jr., Counsel for Defendant/Appellee, Catholic Diocese of Baton ROUGE and A.M., Jr. and C.M.
Before WHIPPLE, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
The parents of a special education student appeal a judgment dismissing their claims against the Catholic Diocese of Baton Rouge for the alleged sexual assault of the student by another special education student during class. For the reasons that follow, we reverse.

FACTS AND PROCEDURAL HISTORY
Prior to the commencement of the 2004-2005 school term, H.B. and A.M. met and began dating. By the time classes began in the fall of 2004, H.B. and A.M. had progressed so far in their relationship as to be considered "boyfriend and girlfriend." During that school term, H.B. and A.M. attended the same school, Redemptorist High School, and were both enrolled in the special education program that was operated by the Catholic Diocese of Baton Rouge ("the Diocese").[2] Although H.B. was enrolling in the program for the first time that fall, A.M. was a returning student to the program.
The special education program at Redemptorist High School is comprised of three classes that are populated by special needs students according to their functioning level. At the time, students of a higher functioning level were placed in a class taught by K. Lynn Robbins. Theresa Little served as the aide for Ms. Robbins' class. Students functioning at a middle or lower level of competency were taught by other instructors. The director of the special education program for the entire Diocese was Gail Campo. At the beginning of the 2004-2005 school term, both H.B. and A.M. were placed in Ms. Robbins' class.
On December 6, 2004, an incident occurred wherein Ms. Little observed A.M. with his hand under H.B.'s skirt while the students were sitting together at a computer in the classroom. Ms. Little summoned H.B. and A.M. outside of the classroom and questioned them about what she observed. She then informed both students that she would report the incident to Ms. Robbins, who was absent from school that day for medical reasons, and advised the students to discuss the matter with their parents. Ms. Robbins, in turn, informed Ms. Campo of the incident. Ms. Campo arranged a meeting to discuss the matter, which was attended by the students, H.B.'s mother, A.M.'s parents and Ms. Robbins. Thereafter, efforts were made to keep the two students separate both at school and outside of school. Nevertheless, on March 15, 2005, a second incident occurred in which A.M. was discovered to have improperly touched H.B at school.
Following the second incident, Ms. Campo arranged another meeting that was attended by Ms. Campo, Ms. Robbins, Ms. Little, both students and their parents. As a result of that meeting and her assessment of the aptitude of the two students, Ms. Campo made the decision to completely remove H.B. from Ms. Robbins' class and to place her in the middle-functioning class; however, S.K., H.B.'s mother, did not agree with the decision, and so she promptly withdrew H.B. from the school.
S.K. and J.B., H.B.'s father, later filed suit claiming damages individually and on behalf of H.B. (collectively "plaintiffs") based on the incidents in which A.M. was discovered improperly touching H.B. at school. Plaintiffs named the Diocese and A.M. Jr. and C.M., as the parents of A.M., as defendants in the suit, but later dismissed their claims against A.M. Jr. and C.M. The matter proceeded to trial solely on the claims asserted against the Diocese. Following a bench trial, the trial court dismissed the plaintiffs' claims against the Diocese, finding that it was not convinced that the incidents of improper touching occurred because the students were unsupervised. The trial court signed a written judgment dismissing the plaintiffs' suit on February 7, 2007, and it is from this judgment that plaintiffs now appeal.

DISCUSSION
In this appeal, plaintiffs contend that the trial court erred in failing to hold the Diocese responsible for the alleged sexual assault of H.B. by another student during class.
Teachers are responsible for the damage caused by their students, while under their superintendence, but such responsibility only attaches when the teachers might have prevented the act that caused the damage and failed to do so. La. C.C. art. 2320. Further, this responsibility extends to a school board, or in this case, the Diocese, as La. C.C. art. 2320 also provides that masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed. Thus, the Diocese, through its agents and teachers, owes a duty of reasonable supervision over students and the supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. See Wallmuth v. Rapides Parish School Board, 01-1779, p. 8 (La. 4/3/02), 813 So. 2d 341, 346.
Yet, the duty to supervise does not make the Diocese the insurer of the safety of the children. Constant supervision of all students is neither possible nor required for educators to discharge their duty to provide adequate supervision. Bell v. Ayio, 97-0534, p. 7 (La. App. 1st Cir. 11/13/98), 731 So. 2d 893, 899, writ denied, 98-3115 (La. 2/5/99), 738 So. 2d 7. Before liability can be imposed on the Diocese, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Further, the unreasonable risk of injury must be foreseeable, constructively or actually known, and preventable, if the requisite degree of supervision had been exercised. Frazer v. St. Tammany Parish School Board, 99-2017, p. 5 (La. App. 1st Cir. 12/22/00), 774 So. 2d 1227, 1232, writ denied, 01-0233 (La. 3/23/01), 787 So. 2d 1001.
The analysis of liability under La. C.C. art. 2320 is essentially the same as under La. C.C. art. 2315. As the court explained in Wallmuth, 01-1779 at 9, 813 So.2d at 347:
[E]ach statute requires that the School Board breach its duty of reasonable supervision over its students. The causation element is satisfied under La. C.C. art. 2315 if it is proven that the breach was the cause-in-fact of the plaintiffs injuries, which in a breach of supervision case can only be satisfied if it is proven that "but for" the lack of reasonable supervision, plaintiffs injuries would have been prevented, which is similar to the "prevention" element of La. C.C. art. 2320. Thus, Louisiana courts appear to have interchangeably analyzed the liability of a school board for damages caused by its students under both La. C.C. arts. 2315 and 2320.
Hence, the question before this court based on the facts of this case is what duty of supervision was owed to H.B. and was that duty reasonably satisfied by the conduct of Ms. Little?
The plaintiffs raise two arguments in support of their assertion that the Diocese breached the duty owed. First, they point out that on both occasions when A.M. was discovered improperly touching H.B. during class, Ms. Robbins, the students' teacher, was absent from school, and Ms. Little, the aide, was left to supervise the class. Thus, the plaintiffs allege that the Diocese failed to provide adequate supervision of the students because a certified and trained teacher was not present in the classroom. The plaintiffs offer no evidence in support of their allegation that the supervision provided by Ms. Little was inadequate solely because she was not certified nor formally trained to teach the students left in her care. Although she was not certified, Ms. Little testified that she had received some training with respect to teaching or being a teacher's aide in West Baton Rouge and further testified that she had worked with a Headstart program in California. Thus, without some evidence establishing that it was improper or inadequate to leave the students in the care and supervision of an aide, we must reject the plaintiffs' argument that Ms. Little's supervision of the students was per se inadequate.
Second, the plaintiffs argue that the trial court should have found that the Diocese breached the duty of supervision owed to H.B. because A.M. was allowed to be physically present in the same classroom and to sit next to H.B. in March 2005, despite knowledge of A.M.'s prior behavior of improperly touching H.B. in December 2004.
According to a handwritten report submitted by Ms. Little, she stated that on December 6, 2004, "[A.M.] put his hand under [H.B.]'s skirt, he was touching her thigh all the way up. I didn't see him touching any where (sic) else." The report then goes on to state that Ms. Little met with the students outside of the classroom and told them that she would report the incident to Ms. Robbins. She also advised the students to tell their parents about the incident.
After being informed of the incident by Ms. Little, Ms. Robbins contacted Ms. Campo, and a meeting was arranged to discuss the matter. Although those present at the meeting uniformly acknowledged an understanding that efforts would be made to keep the two students apart, both in school and out of school, the minutes from the first meeting, as recorded by Ms. Campo, generally reflect that the students were just counseled about their behavior. The students' parents were also advised not to allow the students to go to the movies unsupervised. In summation, Ms. Campo documented that:
I asked both students to behave so that they would not continue to get into trouble, asked the parents to talk to their children and support the teacher, aide and myself so that no further action would have to be taken. I thanked them all for coming for communication between all parties, hopefully would deter any further inappropriate behavior.
Thereafter, efforts were made to keep the two students separate, which efforts apparently included sending the students to separate classrooms to complete some of their assignments during the school day. In email correspondence between Ms. Robbins and S.K. in January 2005, Ms. Robbins related:
Today, [H.B.] and [A.M.] tried to hook up between classes and at lunch. [H.B.] didn't voluntarily go to the other class in the afternoon. I told her she could stay until she finished her science lesson, but she continued to stay beyond this point. I had to make another request. The aide overheard [A.M.] telling [H.B.] that she would have to treat him nicely so she could stay in class. We told [A.M.] that [H.B.] didn't have to be his girlfriend to treat him nicely, and we thought that was an intimidating thing to imply this to her. They both may come to the realization that their behaviors have caused them this problem.
Ms. Campo told me that [H.B.] had to stay in the other class until she said [H.B.] could go back. [H.B.] has been attending math class there all year,[3] and it's been no problem.
The second incident of inappropriate touching occurred on March 15, 2005. In the incident report submitted by Ms. Little about the second incident, she relates the following:
Mrs. Robbins was out sick. Usually she had a group of students at one table, including the young man, and I have another group of students, including [H.B.], at the opposite end of our very large classroom, or [H.B.] is in Mrs. Nerona's[4] classroom. After presenting the science lesson, I sent the other student to another class to complete his seatwork because Mrs. Robbins was out sick, and I needed to separate [H.B.] and him.
I was sitting at the u-shaped table in the front of the room with some students seated around the table and a few standing waiting to get their work checked. The aide from the other class brought him back to class to have his work checked. As I was checking papers, I looked to the right and noticed [H.B.] and him sitting next to each other on the other side of the table two feet away from me. His hands were under the table, so I told him to put them on the table and asked the two of them why were they sitting together. I told them to separate.... I told Mrs. Robbins that night about all of this.
When Ms. Little questioned A.M. about the second incident, A.M. only confessed to placing his hand on H.B.'s lap; however, when Mrs. Robbins later questioned A.M. about the incident, A.M. stated that H.B. took his hand and pulled it under her skirt and in her panties, resulting in his touching her private area.
At the second meeting called by Ms. Campo relative to the March 2005 incident, Ms. Campo again met with Ms. Robbins, the students, S.K., and the parents of A.M. Additionally, Ms. Little and J.B., the father of H.B., attended that meeting. Ms. Campo kept the minutes for the second meeting. During the meeting, some emails and other internet correspondence between H.B. and A.M. were discussed in addition to the incident giving rise to the second meeting. Ultimately, Ms. Campo informed the students' parents that she had made a decision to separate the students "all during the day." She then stated that based on her consideration of each student's functioning level and her belief that both students were at fault and acted inappropriately, she had decided to place H.B. in Ms. Nerona's class and to allow A.M. to remain in Ms. Robbin's class so the students would be completely separated. Ms. Campo noted that S.K. was very angry about the decision. Thereafter, H.B. was withdrawn from the program.
Considering this evidence, particularly the failure of Diocesan employees to place the students in different classes and to keep them completely separate following the first incident, the trial court was clearly wrong in failing to find that the Diocese breached the duty of supervision owed. The unreasonable risk of injury in this case was clearly foreseeable and actually known to the Diocese based on the prior incident that occurred in December 2004 involving the same students engaging in the same inappropriate behavior while together in a classroom setting with a teacher's aide present. Therefore, in light of the December 2004 incident, the requisite degree of supervision required that the students be kept completely separate, which would have clearly prevented the second incident.
The March 2005 incident, like the December 2004 incident, occurred as a result of the Diocese allowing Ms. Little, an aide, to supervise a class alone when the teacher was absent and allowing these two special education students to sit together, at which time A.M. was able to inappropriately touch H.B. Ms. Little had witnessed and reported the first incident and was thus aware of the likelihood of inappropriate behavior occurring if these two students were together. As Ms. Little readily acknowledged, both at trial and in the incident report she submitted in conjunction with the second incident, she was fully aware that A.M. had been returned to her class to have his assignment graded. Yet despite this awareness, rather than immediately taking the precaution of ascertaining that A.M. did not come near H.B., as was required for the proper exercise of the duty owed under the circumstances, she simply continued to grade the assignments she had collected. Her conduct of grading papers while these two special education students sat at the same table was neither reasonable nor competent supervision in light of the past inappropriate behavior in her presence.
Although the duty of supervision owed by the Diocese generally does not require the constant supervision of all students, in light of the past problems involving the students at issue, the attendant circumstances required, at a minimum, that a more diligent and constant degree of supervision be exercised relative to the students in question, particularly when the students were allowed to be in the same classroom. Obviously, the mere presence of Ms. Little was insufficient to deter A.M. from acting inappropriately, as demonstrated by the first incident that had occurred in December 2004, and thus her mere presence does not establish that the supervision exercised was adequate. See Vaughn ex rel. Vaughn v. Orleans Parish School Board, 01-0556 (La. App. 4th Cir. 11/28/01), 802 So. 2d 967, writ denied, 02-0005 (La. 6/7/02), 818 So. 2d 773 (wherein it was found that a teacher failed to reasonably supervise her class when a student was sexually assaulted while the teacher was present in the classroom). Furthermore, Ms. Little, based on her personal knowledge of the December 2004 incident, was aware that a certain level of supervision, consisting of keeping the students apart, was required, which she failed to provide. See Doe ex rel. Doe v. DeSoto Parish School Board, 39,779 (La. App. 2d Cir. 6/29/05), 907 So. 2d 275, writ denied, 05-2020 (La. 2/10/06), 924 So. 2d 167 (wherein the court found that the school administration's awareness of prior sexual misconduct involving teenagers on bus trips for school-sponsored events was sufficient to place the coaches on notice that a certain level of supervision would be required on the subject school-sponsored bus trip). Therefore, we find the Diocese was negligent for failing to adequately supervise the students.
Moreover, we find that the trial court was clearly wrong in holding that the Diocese was not negligent based on its finding that the March 2005 incident occurred, in part, as a result of H.B.'s consensual participation and not solely as a result A.M.'s actions. As the court observed in Desoto Parish School Board, the student's consensual participation in the incident sued upon is not relevant as the Diocese is statutorily responsible for any fault attributable to H.B. See Desoto Parish School Board, 39,779 at 11, 907 So. 2d at 282. We therefore hold that the trial court was manifestly erroneous in holding that the Diocese did not breach the duty of supervision owed.
If the fact finder does not reach an issue because of an earlier finding that disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of undecided issues from the facts presented in the record. Glass v. Magnolia School, Inc., 01-1209, p. 21 (La. App. 5th Cir 3/13/02), 815 So. 2d 143, 155, writ denied, 02-1048 (La. 6/7/02), 818 So. 2d 776.
Since we have found that the Diocese breached the duty owed and that had the requisite degree of supervision been exercised, the harm suffered by H.B. could have been prevented, the only issue left for this court to determine, de novo, is that of damages. According to the petition, the plaintiffs seek damages for the severe and significant physical, mental and emotional distress suffered by H.B.; exemplary damages pursuant to La. C.C. art. 2315.7, based on the Diocese's alleged wanton and reckless disregard for the rights and safety of H.B.; and loss of consortium damages for S.K. and J.B.
We will first consider the claims of loss of consortium by S.K. and J.B. Loss of consortium includes such pecuniary elements as loss of services and such nonpecuniary components as loss of love, companionship, affection, society, sexual relations, comfort, and solace. Pena v. Delchamps, Inc., 06-0364, p. 13 (La. App. 1st Cir. 3/28/07), 960 So. 2d 988, 995, writ denied, 07-0875 (La. 6/22/07), 959 So. 2d 498. In general, a claim for loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Lewis v. State Farm Insurance Company, 41,527, p. 22 (La. App. 2d Cir. 12/27/06), 946 So. 2d 708, 724.
Based on the record before us, we find that there was some, although limited, impact on familial ties based on the evidence presented. We award $500.00 to the father and $1,000.00 to the mother, who had limited counseling. We believe this amount to be reasonable given the family's history involving H.B. and A.M.'s ongoing relationship, which impacted the particular circumstances of this case.
We now must consider H.B.'s individual claim for general damages. General damages are those, which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual or physical enjoyment, or other losses of life or of lifestyle, which cannot really be measured definitively in terms of money. Hymel v. HMO of Louisiana, Inc., 06-0042, p. 24 (La. App. 1st Cir. 11/15/06), 951 So. 2d 187, 204-205, writ denied, 06-2938 (La. 2/16/07), 949 So. 2d 425.
At the time the incidents occurred, H.B. was 14 years old and A.M. was one year older. H.B. was diagnosed as being developmentally delayed, hearing impaired and having Attention Deficit/Hyperactivity Disorder. H.B. also had a psychological testing age of seven years old.
Several witnesses testified at trial regarding the incidents that gave rise to this suit. Both H.B. and A.M. were asked to describe what occurred during the March 2005 incident. H.B. testified, "I was sitting down doing my work, and he just came by and sat by me, and put my (sic) hands on my lap (sic) and he just put his hands up in my skirt." She said that following the incident she felt bad and wanted to tell the teacher and call her mom to come get her. A.M. acknowledged that he sat by H.B. and that he put his hand on her left knee, but stated that H.B. took his hand and placed it under her skirt and in her panties to touch her private area.[5] Following the occurrence, Ms. Little, who also testified at the trial, stated that she observed H.B. "walk up behind A.M. and put her arm through his arm and lean her head on his shoulder" on the way to the bus after school that same day.
Following the March 2005 incident, S.K. testified that she learned of the occurrence the day after it had occurred when she questioned H.B. because "she was just whining and crying." S.K. stated that H.B. told her that her bottom hurt and that A.M. had touched her private area. S.K. immediately took H.B. to the Baton Rouge Clinic, where a pediatrician examined H.B. According to the medical record of that visit, the pediatrician indicated that H.B.'s chief complaint was a possible bladder infection, but also noted H.B.'s statements that "Boyfriend touched her [private area] while at school Monday  under desk  did once before at movies last year & didn't like that."
S.K. also testified that the week following the March 2005 incident, she and H.B. began receiving counseling because of the incident. S.K. testified that they treated with a psychiatrist and psychologist following the March 2005 incident, but the only medical records that were placed into evidence were for visits to the psychiatrist. Those records indicate that only two, possibly three, visits occurred.[6] The first documented visit occurred before the March 2005 incident on February 21, 2005. According to the handwritten note of that visit, H.B. told the psychiatrist that she had a boyfriend at Redemptorist that she started to break up with and he would cry. The doctor further notes that H.B. said "she has difficulty letting him go, will say to him `I love you.'" In the second medical note, dated April 11, 2005, the psychiatrist relates that H.B. told him that a boy in her class "put his hand up her skirt in my [private area]." The doctor notes that H.B. "[i]sn't depressed but morn is depressed" and that H.B. "[vacillates] between sad and happy." The doctor further quotes H.B. as saying "I miss [A.M.]  try to find a new one." S.K. testified that H.B. visited the psychologist at least six times and still sees her "on and off."
S.K. stated that in the months following the second incident andH.B.'s removal from Redemptorist, both she and H.B. were "traumatized because of the way that [they] were treated by the Catholic Diocese." She further stated that she and H.B. cried and were depressed, but acknowledged that H.B. is "a pretty happy kid most of the time, but she will have little episodes where she is depressed."
Finally, evidence was also presented regarding H.B. and A.M.'s relationship outside of school that had begun prior to the commencement of the 2004-2005 school term. As part of their dating relationship, H.B. and A.M. would go to movies together or visit with one another in their respective homes. There was evidence presented at trial that on some of their dates, H.B. and A.M. would engage in acts of sexual touching while at the movies and while sitting on a couch with a blanket draped over them at either A.M's or H.B.'s home. There were also copies of several very explicit email conversations between H.B. and A.M. that were identified by H.B. and introduced into evidence.
Considering the foregoing, specifically the mother's testimony, yet tempered by the limited medical records that were introduced into evidence and H.B.'s role in this incident, we find that H.B. suffered some minor, temporary physical pain and emotional distress because of the March 2005 incident. Thus, in view of the extent of the harm inflicted, we find that a general damages award of $5,000.00 is sufficient to compensate H.B. for the injuries she sustained given the circumstances of this case. As for the plaintiffs' request for an award for exemplary damages pursuant to La. C.C. art. 2315.7, we find the evidence insufficient to make such an award. Although we find that the Diocese was negligent in its supervision of H.B. and A.M. under the circumstances presented, the conduct of its employees falls significantly short of what is normally described as wanton or reckless.

CONCLUSION
Accordingly, we reverse the judgment of the trial court dismissing the plaintiffs' suit against the Diocese. We hereby render judgment in favor of the plaintiffs in the amount of $5,000.00 in general damages and $1,500.00 for loss of consortium. The claim for exemplary damages is denied. All costs of this appeal are assessed to the Catholic Diocese of Baton Rouge.
REVERSED AND RENDERED.
HUGHES, J.,concurring.
I respectfully concur. While I generally agree with the majority, it seems to me the school placed the aide in an untenable position and therefore the school should be liable. While I find the damage award to be overly generous considering all factors, I will concur as ending this matter as soon as possible is best for the young persons involved.
NOTES
[1] Pursuant to Rules 5-1 and 5-2 of the Uniform RulesCourts of Appeal, the initials of the parties involved will be used to protect the identity of the minors involved in this matter.
[2] According to the Parent Student Handbook, the Department of Special Education is a Diocesan Program under the jurisdiction of the Diocesan School Office and operated through the Special Education Central Office at the Diocesan level. Students, faculty, and finances are under the jurisdiction of the Department of Special Education and not the administration of the school where the students are housed.
[3] At trial, Ms. Campo explained that in populating the three special education classes at Redemptorist, the goal was to place students in the class as close to their overall functioning level as possible, while trying to balance the apportionment of students among the three classes. As she explained, "I can register children to even classes out, and again, it is a judgment call on my part that I may have children working on various levels and group them in [a] class." Moreover, Ms. Campo explained that assigning students to a particular teacher's class would be more appropriately referred to as assigning the students to a "homeroom" class, since students could be sent to another class for particular subjects based on their competency level for the particular subject.
[4] Ms. Nerona taught the class for students classified as being of a middle functioning level.
[5] A classmate of H.B. and A.M. who allegedly observed the March 2005 incident of touching testified at trial and also stated that it was H.B. who had placed A.M.'s hand in H.B.'s skirt; however, because of several critical discrepancies in the classmate's testimony, we do not consider it for purposes of our de novo review of this matter.
[6] The handwritten medical note for the third visit simply states that a prescription for Prozac was "called in."